**UNITED GAS PIPE LINE COMPANY, Appellant,**

v.

**MUELLER ENGINEERING CORPORATION, Appellee.**

No. 13–90–454–CV.

Court of Appeals of Texas, Corpus Christi.

April 25, 1991.

Gregg C. Laswell, Houston, for appellant.

J. Norman Thomas, Corpus Christi, for appellee.

Before NYE, C.J., and BENAVIDES and HINOJOSA, JJ.

## OPINION

NYE, Chief Justice.

This is an action for the alleged breach of a gas purchase contract. The trial court granted two summary judgments favorable to appellee, Mueller Engineering Corporation, and denied a summary judgment filed by appellant, United Gas Pipe Line Company. United appeals from a final judgment which ordered that Mueller recover from United $173,085.91 in unpaid gas payments and interest. United appeals by five points of error. We reverse and remand.

Pursuant to a "GAS PURCHASE CONTRACT" dated July 29, 1980, Mueller agreed to sell natural gas to United. It is undisputed that when gas sales commenced, the Natural Gas Policy Act of 1978 [1] regulated the price of the gas sold under the contract. The parties, anticipating that the federal government would lift

1. *See* 15 U.S.C.A. § 3301, *et seq.*, (1982).

its price restrictions, inserted an alternative pricing mechanism into the contract. Both parties agree that the pricing mechanism is clear and unambiguous. The pricing mechanism, found in Article IV of the contract, stated as follows (emphasis ours):

### PRICE

1. *Specific Price*

   A. *Base Price*

   Subject to the other provisions hereof, the price to be paid by Buyer to Seller for each one thousand (1,000) cubic feet (Mcf) of gas containing one million (1,000,000) British Thermal Units (MMBTU) sold by Seller to Buyer hereunder shall be as follows:

   (i) For the purposes hereof, the base price per Mcf shall be $1.00 for the period beginning on the date deliveries of gas commence hereunder and ending at 7:00 A.M. on the first day of the succeeding calendar month.

   (ii) *For each succeeding month after the expiration of the period set forth in (i) above, the base price shall be obtained by multiplying the base price paid in the previous month by the applicable inflation adjustment factor* as published by the Federal Energy Regulatory Commission (FERC) in the Federal Register pursuant to Section 271.102 of the FERC's Regulations Implementing the Natural Gas Policy Act of 1978.

   B. *BTU Price Adjustment*

   In the event that the heating value of the gas purchased hereunder shall be more than or less than 1,000 British Thermal Units per cubic foot, the base price set out in A. above currently in effect shall be increased or decreased, as the case may be, by multiplying the same by a fraction, the denominator of which shall be 1,000 British Thermal Units per cubic foot and the numerator of which shall be the British Thermal Unit heating value per cubic foot of such gas.

C. *Tax Reimbursement*

Buyer agrees to reimburse Seller for one hundred percent (100%) of the Taxes per Mcf paid by Seller with respect to gas sold hereunder.

D. *Gathering Allowance*

In the event that Seller performs gas gathering activities (as defined in Federal Power Commission Opinion No. 770 issued July 27, 1976, in Docket No. RM75–14, for the area in which the gas covered hereby is located) prior to delivery of such gas to Buyer at the delivery point hereunder, the price per Mcf provided in A. above, adjusted for BTU content and Tax reimbursement as provided respectively in B. and C. above, shall be adjusted for gathering activities by adding thereto a gathering allowance of $.003978 per Mcf.

2. *Area Rate*

*If at any time the Area Rate shall, for any Mcf of gas sold hereunder, be greater than the total current payment computed under [Section] 1. above, the provisions of 1. above shall be inapplicable to any such gas sold hereunder and such Area Rate shall be the price payable* for such gas sold hereunder so long as the Area Rate remains greater.

The term "Area Rate" was based upon a regulatory provision which was referred to in the contract as follows:

The term *"Area Rate,"* as used herein, shall mean the lesser of (i) the applicable rate, including any applicable adjustments, determined as a result of any statute (including, without limitation, the Natural Gas Policy Act of 1978 [NGPA]), order, settlement or any other ruling of the Federal Energy Regulatory Commission (FERC) or any other Federal governmental authority, including the Congress, having jurisdiction, fixing the rate generally applicable to gas produced from the area where the lands and leaseholds covered by this contract are located, or (ii) the regulated ceiling price as provided in Section 102 of the NGPA and regulations issued by the FERC thereunder.

In December, 1984, United paid Mueller $38,894.05 for its gas. Effective January 1, 1985, the gas sold under the contract was deregulated and was no longer subject to the NGPA price restrictions. In January, 1985, United paid Mueller $11,534.33 for its gas. On July 1, 1985, Mueller and United terminated their contractual relationship.

On June 2, 1986, Mueller filed suit against United and Sandra H. Montague, alleging breach of contract, violations of the DTPA, fraud and "other illegal acts." Pursuant to an "AGREED ORDER OF NON–SUIT" dated December 10, 1987, a non-suit was entered against Montague, and Mueller's claims were limited to the breach of contract action. The breach of contract action concerns Mueller's allegations that United failed to pay the proper price for the gas delivered under the contract from January 1, 1985, through June 30, 1985.

It is undisputed that United paid Mueller the area rate price for its gas in December, 1984. It is also undisputed that the area rate price, due to deregulation, did not exist after January 1, 1985; therefore, Article IV, Section 1(ii) governed the price payable for gas from January, 1985, through June 30, 1985. The controversy concerns the *method* in which United determined the price payable for the gas under Article IV, Section 1(ii) which was to be paid to Mueller from January, 1985, through June, 1985.

On February 5, 1988, United moved for summary judgment on two bases: liability; and a set-off for overpayment. United asserted the following: Article IV, Section 1 formulated a "base price" to be paid for the gas purchased during each month of the contract. Prior to January, 1985, the area rate price in Article IV, Section 2 was higher each month than the "base prices" calculated in accordance with Article IV, Section 1, Thus, Section 1 became inapplicable, and the price paid for gas purchased each month was the area rate price. Beginning in January, 1985, the area rate price ceased to exist due to deregulation. The price for the gas purchased from January 1, 1985, through June 30, 1985, must be determined under Article IV, Section 1.

Under Article IV, Section 1, the "base price paid" for gas delivered during January, 1985, should be the "base price" *payable* in December, 1984, escalated by the appropriate FERC inflation factor.

United also asserted that from January, 1985, through June, 1985, it underpaid Mueller $5,509.12 for gas purchased under the contract. On the other hand, from June, 1981, through December, 1984, it overpaid Mueller $75,791.76 for gas purchases under the contract. United contended that its $75,791.76 overpayment is offset by the $5,509.12 underpayment in that amount.

United's summary judgment evidence consisted of John Hague's affidavit, a copy of the contract and Exhibits B and C. Hague, United's contract management director, declared that the contract required the determination each month of a "'base price,'" plus adjustments reflecting the gas' heat content, a reimbursement of state severance taxes paid by Mueller, and Mueller's gathering fee. This amount became the "total current payment." The total current payment was compared to the Area Rate, and if the Area Rate was greater, the Area Rate price became the contract price. If the Area Rate was not greater, or if there was no Area Rate, then the "total current payment" represents the contract price. After deregulation, the Area Rate ceased to exist, and the price calculated pursuant to Article IV, Section 1 became the contract price.

Hague also stated that Exhibit B contains contract price calculations pursuant to the methodology set forth in Article IV, Section 1 of the contract for January 1, 1985, through June 30, 1985. These price calculations include severance tax reimbursements and the gathering fee. Additionally, these price calculations are compared to the amount which United tendered to Mueller as payment for gas received. United did not pay the full amount due under the contract for gas deliveries from January 1, 1985, through June 30, 1985. The amount of the underpayment is $5,509.12. From June, 1981, through December, 1984, United mistakenly reimbursed Mueller for its state severance tax payments and its gathering fee in addition to paying the area rate. The contract did not require payments in addition to the area rate. Exhibit C contains calculations showing the amount which United overpaid Mueller. The amount is $75,791.76.

On April 7, 1989, Mueller moved for a partial summary judgment on the liability issue. Mueller asserted that the price which United should have paid for the gas from January, 1985, through June, 1985, must be based on the price actually paid in December, 1984, that is, the area rate price. Mueller's summary judgment evidence consisted of a copy of the contract and the affidavit of Deanna Schupbach, Ph.D. Dr. Schupbach, a Del Mar College English professor, declared, in relevant part:

"I have reviewed the gas purchase contract which is at issue in ... [this] case.... I have paid particular attention to the pricing provisions in Art. IV of the contract. The pricing provisions in the contract are clear and unambiguous. The choice of words, the division of paragraphs, and the grammatical sentence structure, all of which are within my area of expertise, leave no doubt as to how the gas is to be priced, given the normal and correct use of the English language.

"Based on the words selected, it is clear that a "base price" of $1/Mcf was established for the initial monthly period [Art. IV, § 1(A)(i)]. Thereafter, "the base price" for the next month was the *"price paid"* per Mcf the previous month multiplied by an inflation adjustment factor [Art. IV, § 1(A)(ii)].

"An Area Rate was to be paid if it exceeded the "base price" of $1/Mcf for the initial monthly period. Additionally, an Area Rate was to be paid if it exceeded the "price paid" per Mcf in the previous month, adjusted for inflation. If the "price paid" in any one month was the Area Rate, then the Area Rate became "the base price paid," and that rate should have been adjusted for the succeeding month by applying the applicable inflation adjustment factor, and this

method should have continued for the duration of the contract.

"Certainly, it is clear that, under the language of the contract, the "price paid" per Mcf in any given month could never be less than the price actually paid per Mcf in the previous month adjusted for inflation. For example, the January payment in any year would be either the December payment per Mcf adjusted for inflation or the Area Rate for January, whichever was greater. If there were no Area Rate for January, obviously, the December payment adjusted for inflation would be greater."

On May 2, 1989, the trial court granted Mueller's motion for partial summary judgment and denied United's summary judgment motion. On October 20, 1989, Mueller moved for summary judgment on the damages issue. Mueller applied the "Court-approved pricing provision" to United's monthly gas payment schedule. Mueller alleged that it incurred $259,613.02 in damages and $85,148.00 in interest.

Mueller's summary judgment evidence consisted of a copy of the contract, a copy of United's spread sheets, and the affidavits of Michael J. Sullivan, W. Scott Turner and Joseph P. Mueller. Turner, a certified public accountant, declared that he calculated the amount of monthly overpayments and underpayments which United made to Mueller from September, 1980, through June, 1985. His calculations were made in conformity to the "Court-approved pricing interpretation." Turner calculated that United should have paid Mueller $259,-613.02, and that interest on this amount would be $85,148.00.

Sullivan, an attorney with the law firm representing Mueller, declared that United provided the spreadsheets used by Turner. Hague, Mueller Engineering's president, declared that the copy of the contract is true and correct.

On March 2, 1990, the trial court granted Mueller's second summary judgment motion. The trial court ordered that Mueller recover from United $131,927.56 in unpaid gas payments from February 25, 1985, to July 15, 1985, plus $41,158.35 in interest through July 30, 1990, increasing at a per diem rate of $21.68 until the judgment date.

When both parties move for summary judgment, each party must carry his own burden, and neither can prevail because of the failure of the other to discharge his own burden. *Federal Deposit Insurance Corp. v. Attayi*, 745 S.W.2d 939, 941 (Tex.App.—Houston [1st Dist.] 1988, no writ); *The Atrium v. Kenwin Shops of Crockett, Inc.*, 666 S.W.2d 315, 317–18 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). Each being a movant, the burden is the same for both parties: to establish entitlement to a summary judgment by conclusively proving all the elements of the cause of action or defense as a matter of law. *Odeneal v. Van Horn*, 678 S.W.2d 941 (Tex.1984); *Attayi*, 745 S.W.2d at 941. When both parties move for summary judgment and one motion is granted and the other is overruled, all questions presented to the trial court may be presented for consideration on appeal should error be properly preserved. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988); *Buckner Glass & Mirror, Inc. v. T.A. Pritchard Co.*, 697 S.W.2d 712, 714 (Tex. App.—Corpus Christi 1985, no writ).

A summary judgment is proper only when the movant establishes that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985); *R.I.O. Systems, Inc. v. Union Carbide Corp.*, 780 S.W.2d 489, 490 (Tex.App.—Corpus Christi 1989, writ denied). In deciding whether a disputed material fact issue exists to preclude a summary judgment, evidence favorable to the non-movant will be accepted as true. Thus, every reasonable inference will be indulged in favor of the non-movant and any doubts resolved in the non-movant's favor. On appeal, as well as at trial, the issue is not whether the summary judgment proof raises fact issues regarding the essential elements of the plaintiff's claim or cause of action, but rather, whether the summary judgment proof establishes as a matter of law that there is no genuine

issue of fact concerning one or more of the essential elements of the plaintiff's cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970); *R.I.O. Systems*, 780 S.W.2d at 490.

■ By point one, United complains that the trial court erred in granting Mueller a partial summary judgment on the liability issue. By point two, United complains that the trial court erred in denying United's summary judgment on the liability issue. In considering this summary judgment, appellants argue that Dr. Schupbach's affidavit is inadmissable because it presents her opinion concerning a legal question. Rule 702, Texas Rules of Civil Evidence, concerning testimony by experts, provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

We do not regard Dr. Schupbach's expert opinion as probative because, although she may be an expert in the English language, the question of what price should have been paid for the gas from January, 1985, through June, 1985, is not a matter for an English professor but for the court. Her testimony that the contract is unambiguous invades the province of the trial court to decide the question as a matter of law. If believed, it proves that the contract is ambiguous because it calls for extrinsic evidence to explain the pricing of the contract.

■ In construing a written contract, the primary concern of the court is to ascertain the parties' true intentions as expressed in the instrument itself. *Reilly v. Rangers Management, Inc.*, 727 S.W.2d 527, 529 (Tex.1987); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *Cambridge Oil Co. v. Huggins*, 765 S.W.2d 540, 543 (Tex. App.—Corpus Christi 1989, writ denied); *Corriveau v. 3005 Investment Corp.*, 697 S.W.2d 766, 767 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). All provisions in a contract must be considered with reference to the whole instrument. *Coker*, 650 S.W.2d at 393; *First Victoria National*

*Bank v. Briones*, 788 S.W.2d 632, 634 (Tex. App.—Corpus Christi 1990, writ denied); *Corriveau*, 697 S.W.2d at 767. If the written instrument is so worded that it can be given a certain definite meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a matter of law. *Coker*, 650 S.W.2d at 393; *Huggins*, 765 S.W.2d at 543; *Corriveau*, 697 S.W.2d at 767. A court should construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served. *Reilly*, 727 S.W.2d at 530.

■ Language used by parties in a contract should be accorded its plain, grammatical meaning unless it definitely appears that the parties' intention would thereby be defeated. *Reilly*, 727 S.W.2d at 529; *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex.1985). When construing the terms of an instrument, we will presume that they will be given their plain, ordinary and generally accepted meanings unless the instrument itself shows them to have been used in a technical or different sense. *Milton v. Aransas Shrimp Co-op.*, 668 S.W.2d 735, 739 (Tex.App.—Corpus Christi 1983, writ dism'd).

■ It is undisputed that United paid Mueller the federally regulated "Area Rate" price for the gas in December, 1984. When deregulation became effective in January, 1985, the "Area Rate" ceased to exist. Therefore, Article IV, Section 1 became the only mechanism governing the price of the gas sold under the contract from January 1, 1985, through June, 1985. According to Article IV, Section 1(ii), the price which United should have paid to Mueller during this six-month period was the "base price" which "shall be obtained by multiplying the *base price paid* in the previous month by the applicable inflation adjustment factor...."

The problem is that there was not a "base price paid" in December, 1984, and nothing in the contract determines which amount should be paid if no base price is paid. The price that United paid to Mueller for its gas in December, 1984, was the

federally regulated "Area Rate" price. There is no provision in the contract which transforms the "Area Rate" price into the "base price." In fact, according to Article IV, Section 2, the "Area Rate" was intended to be a substitute for the base price during any month in which it was higher than the base price. Although both parties contend that the contract is unambiguous, we cannot follow each party's interpretation of the contract without some extrinsic interpretive evidence to support their respective positions. The contract as written is ambiguous because it lacks a provision to determine "the price" if no "base price" was paid in the previous month. As such, a fact issue exists preventing the granting of summary judgment. We need not address appellants' remaining points. Tex.R. App.P. 90(a).

The trial court's judgment is REVERSED and the cause is REMANDED for trial not inconsistent with this opinion.

BENAVIDES, J., not participating.