**DORCHESTER MASTER LIMITED PARTNERSHIP, et al., Appellants,**

v.

**DORCHESTER HUGOTON, LTD., Appellee.**

No. 13–94–243–CV.

Court of Appeals of Texas, Corpus Christi.

Jan. 18, 1996.

Rehearing Overruled Jan. 18, 1996.

---

Eugene M. Nettles, Scott, Douglass & Luton, Houston, Ray N. Donley, Scott, Douglass & Luton, Houston, Roy Antley, Scott, Douglass & Luton, Houston, for appellants.

Vincent L. Marable, III, Wharton, Paul Webb, Wharton, James P. Wallace, Soules & Wallace, Austin, Luther H. Soules, III, Soules & Wallace, San Antonio, for appellee.

Before SEERDEN, C.J., and YAÑEZ and CHAVEZ, JJ.

## OPINION

CHAVEZ, Justice.

We overrule appellee's motion for rehearing, withdraw our opinion issued on October 5, 1995, and substitute this opinion in place of the withdrawn opinion.

In the trial court, appellants sought declaratory relief to establish their rights to ownership of a gas-gathering system and processing rights to the gas produced from an oil and gas field situated in the State of Oklahoma. Appellee successfully obtained dismissal of these claims on the grounds that the trial court lacked subject matter jurisdiction by contending that those claims would necessitate adjudication of title to real property in another state. Appellants appeal the dismissal orders in two points of error, which we sustain.

Appellee cross-appeals from orders granting appellants partial summary judgments, reduced to final judgment, which:

1. declared that the adoption of an amendment to a gas purchase contract to be effective January 1, 1993 had the effect of terminating a 1982 gas processing agreement;

2. found that appellants had no liability to appellees for failure to comply with a provision of a 1946 Gas Purchase Contract which limited the quantity of BTU's that could be extracted from the gas stream during processing (the overextraction claim);

3. found that appellees were not entitled to damages on their overextraction and unjust enrichment counter-claims; and,

4. awarded appellants attorney fees incurred in the litigation and on appeal.

We overrule all of appellee's cross-points of error, except the cross-point directed to the award of attorney fees in the event of appeal.

We first address appellants' points of error regarding the dismissal order because such jurisdictional issues can affect the scope of our authority to review an appeal. *See, e.g., Brown v. Aetna Casualty & Sur. Co.,* 135 Tex. 583, 145 S.W.2d 171, 174 (1940). The standard of review for a trial court's dismissal for want of subject matter jurisdiction requires that we look to the pleader's intent and construe the pleadings in favor of the plaintiff. *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993); *City of McAllen v. Garza,* 869 S.W.2d 558, 560 (Tex.App.—Corpus Christi 1993, writ denied). Although the facts are generally not in dispute, the following discussion and analysis of the facts relevant to our review of the dismissal order necessarily reflect this standard of review. *Brown,* 145 S.W.2d at 174.

The oil and gas field in question was first developed by Harrington & Marsh in the mid 1940s and is recognized as perhaps the most prolific gas field in the United States. The field is known as the Oklahoma/Kansas Hugoton properties, contains over 100 producing wells on some 78,000 acres of land, and is situated in Texas County, Oklahoma. In 1946, Harrington & Marsh agreed to sell, after processing, all the residue gas (dry natural gas) produced from the field to Natural Gas Pipeline Company of America (Natural) and executed a contract for that purpose. The contract is referred to as the 1946 Gas Purchase Contract (the Contract). To carry out the terms of the Contract, Harrington &

Marsh constructed a gas-gathering system and processing plant in Hooker, Oklahoma. The gathering system is referred to as the Hooker Gas Plant gas-gathering system, and the plant is called the Hooker Gas Processing Plant.

By June 16, 1982, Dorchester Gas Producing Co. (hereafter referred to as D.G.P.C.) had succeeded to all of Harrington & Marsh's ownership of the leasehold interests and obligations under the Contract. On that date, D.G.P.C. owned the following:

1. 100% of the leasehold working interests in the properties, including the 100+ producing gas wells;

2. the gas-gathering system (which included a compression plant);

3. the Hooker Gas Processing Plant;

4. the rights to process all gas attributable to the properties; and,

5. the right to sell the residue gas under the terms of the 1946 Gas Purchase Contract with Natural.

At a board of directors meeting held on June 16, 1982, D.G.P.C.'s parent company, Dorchester Gas Corporation (D.G.C.), approved a plan by which its stockholders could more fully realize the true asset value of the company. Pursuant to the plan, D.G.C. declared a dividend whereby 80% of the company's working interests in the Oklahoma/Kansas Hugoton properties would be conveyed, free and clear of all debt but subject to existing contracts, to an oil and gas limited partnership to be created and entitled Dorchester Hugoton, Ltd. (appellee herein). The interests conveyed, however, did not extend beyond the wellhead and did not include assignment of D.G.P.C.'s rights under a "keep whole" contract to process all gas attributable to the properties. Then at a special board meeting, D.G.P.C., in order for D.G.C. to carry out its plan, declared a dividend to D.G.C. by conveying to it 100% of the leasehold working interests in the properties. D.G.C. subsequently exchanged one

unit in appellee for each ten shares of stock held by its stockholders. Appellee, as part owner of the leasehold working interests in the properties, was to continue to sell its share of the residue gas to Natural under the terms of the Contract. In order to accomplish this, however, the plan called for appellee to contemporaneously enter into a gas processing agreement with D.G.P.C.

Accordingly, the 1982 Gas Processing Agreement (the Agreement) was executed by D.G.P.C. as processor and appellee as owner.[1] The Agreement recognized that:

1. the Owner (appellee) had a contract, the 1946 Gas Purchase Contract, with Natural whereby Owner was required to deliver all gas produced from the properties to Natural as shown by the Contract, to which reference was made;

2. as Owner of the leasehold, appellee had the right to process the gas under the Gas Purchase Contract as amended;

3. the Processor (D.G.P.C.) owned and operated a gasoline extraction plant and appurtenant gas dehydration facilities situated in Texas County, Oklahoma, including gas-gathering pipelines for the delivery of raw gas to the plant; and,

4. Owner desired to have the gas processed to recover demethanized liquids and deliver the remaining residue gas to Natural.

The Agreement provided that D.G.P.C. would process the gas and incur the costs in the operation and maintenance of its plant, gas-gathering pipelines and individual wellhead metering facilities. D.G.P.C. was allowed to extract natural gasoline and other hydrocarbons during the processing, sell them to third parties, and then deliver the residue gas (dry natural gas) to Natural. D.G.P.C. was also required to pay appellee for fuel and shrinkage at the same price Natural paid for the residue gas pursuant to the pricing provisions of the 1946 Gas Purchase Contract.[2]

---

**1.** The decision to declare the dividend, all transactions necessary to carry out the board's intentions, including the creation of the limited partnership, transfer of interests and execution of

other agreements, apparently all took place on the day that D.G.C.'s board met, June 16, 1982.

**2.** During the processing, some gas is lost and the processor extracts a portion of liquid hydrocar-

Immediately after the spinoff on June 16, 1982, appellee continued negotiations to increase the price of gas that D.G.P.C. had previously initiated with Natural. Despite these negotiations, the price of gas under the Contract remained subject to Federal Energy Regulatory Commission minimum rate regulations. These rates changed on a monthly basis, and from July 1982 to December 1992, the rates went from 27.4¢/mcf to 40.2¢/mcf. It was understood by the D.G.C. corporate family that the increase in price brought about by the monthly rate changes would have the effect of increasing D.G.P.C.'s payment to appellee for fuel and shrinkage. To offset these anticipated and future increases in cost to D.G.P.C., on October 18, 1982, D.G.C. assigned to D.G.P.C. the remaining undivided 20% leasehold working interest in the properties. In this manner, by virtue of its ownership of a 20% leasehold working interest, D.G.P.C. would be able to benefit from any increase in price Natural paid, and thus it could recoup the corresponding increased price it would be required to pay appellee for fuel and shrinkage.

In 1984, Dorchester Master Limited Partnership (D.M.L.P.), purchased all of D.G.P.C.'s interests and assumed all of its obligations under existing contracts.[3] One of those contracts was an Operating Agreement which provided either party a preferential right to purchase in the event either party desired to sell all or a part of their interests in the properties. D.M.L.P. received an offer from another company in 1986 to purchase the 20% leasehold working interest. D.M.L.P. notified appellee of the offer and appellee then exercised its rights and purchased D.M.L.P.'s 20% leasehold working interest. Thus, appellee became owner of 100% of the leasehold working interests in the properties and D.M.L.P.'s sole role became that of processor.

Then, claiming that the price Natural was paying for the residue gas was very low, appellee sued Natural in 1990 and sought cancellation of the 1946 Gas Purchase Contract. D.M.L.P., appellant herein, intervened in the lawsuit because any cancellation or modifications of the Contract pricing provisions would affect the amount they would have to pay for fuel and shrinkage. In October 1992, after appellee asserted that appellants did not own the processing rights, appellants amended their intervention and sought declaratory relief to establish its claim to the ownership rights to process all gas attributable to the properties.[4] In a deposition the following month, appellee's representative testified that appellee actually was the company that owned the Hooker Gas Plant gas-gathering system. Accordingly, appellants amended their intervention again and sought declaratory relief over the gathering system's ownership.[5] Appellee moved for dismissal of these two claims on the ground of subject matter jurisdiction, asserting that the court had to determine rights and title to real property in Oklahoma in order for it to adjudicate the claims. The trial court agreed and dismissed the claims. Appellants appeal from those adverse rulings.

On December 2, 1992, appellee and Natural settled their lawsuit. As part of the settlement agreement, appellee and Natural agreed to amend the 1946 Contract, effective

bons from the gas stream to be used as fuel for its plant. This lost and used gas is sometimes referred to as fuel and shrinkage.

3. There is no ownership or other corporate relationship between D.H.L., D.G.P.C., D.G.C. family, and D.M.L.P. D.M.L.P. is owned by Damson Oil Corp., the principal being Barre Damson.

4. D.M.L.P., Damson's General Partner, filed the intervention. On February 19, 1991 D.M.L.P. entered into an Exchange Agreement whereby Parker & Parsley Gas Processing Co. became the general partner. Appellants, therefore, consist of D.M.L.P., Parker & Parsley Gas Processing Co. and its related companies, Parker & Parsley De-

velopment Company and Midland Gas Processing Co. They are collectively referred to as appellants.

5. During the pendency of the lawsuit, different events caused the parties to change position. Appellants first sought to declare the Contract as valid and enforceable, claiming they owned the rights to process the gas and that they were parties to the Contract. Appellee opposed these assertions claiming appellants were mere third party contractors performing appellee's obligations under the Contract and its obligations to process the gas for appellee arose from the processing agreement.

January 1, 1993, so as to allow the price of gas to be set according to market responsive pricing, thus dramatically increasing the price of gas and, correspondingly, appellants' cost for fuel and shrinkage.[6] After Natural's departure from the lawsuit, appellants moved to have the parties realigned and appellants became the plaintiffs and appellee the defendant. Appellants also changed their claims for relief and claimed that the January 1, 1993, amendment to the Contract had the effect of terminating the 1982 Gas Processing Agreement by triggering Paragraph 9 of the Agreement, which reads as follows:

"9. This Agreement shall be and continue in full force and effect from and after the date hereof so long as gas covered hereby is delivered by OWNER under terms of the Gas Purchase Contract as amended."

The trial court granted appellants' motion for summary judgment on their termination claim, and appellee cross-appeals from this adverse ruling.

Appellee filed a counterclaim for breach of contract and unjust enrichment by reason of an overextraction claim assigned to it by Natural as another part of their settlement agreement. The trial court granted appellants summary judgment on appellee's counterclaims and also awarded them attorney fees. Appellee cross-appeals from these adverse rulings.

■ Appellants, in their first point of error, contend that the trial court erred in dismissing their claim to ownership of the Hooker Gas Plant gas-gathering system for want of subject matter jurisdiction because the property in question is personalty and not realty. In its motion to dismiss, appellee contended that the gas-gathering system was comprised of pipelines, easements and rights of way and, therefore, involved realty. Since the property is situated in the State of Oklahoma, appellee contended, the trial court lacked subject matter jurisdiction to adjudicate this controversy.

■ The supreme court has defined "jurisdictional power" to mean "jurisdiction

over the subject matter, the power to hear and determine cases of the general class to which the particular one belongs." *Deen v. Kirk,* 508 S.W.2d 70, 72 (Tex.1974). Jurisdiction is not created by pleadings but by the duty and power of the court to act as conferred by the Texas Constitution, statutory enactments, and the existence of facts necessary for the court to exercise its jurisdiction. *Giddens v. State,* 818 S.W.2d 501, 502 (Tex. App.—Corpus Christi 1991, no writ). Whether a court has jurisdiction to hear a case is a question of law. *North Alamo Water Supply Corp. v. Texas Dept. of Health,* 839 S.W.2d 455, 457 (Tex.App.—Austin 1992, writ denied). And, unless it is clear from the pleadings that the court lacks jurisdiction, it should retain the case. *Peek v. Equipment Serv. Co.,* 779 S.W.2d 802, 804 (Tex.1989). A presumption, therefore, lies in favor of jurisdiction. *Id.* While we recognize that a court has the duty to dismiss a controversy when it becomes apparent that it has no authority to adjudicate it, *City of Beaumont v. West,* 484 S.W.2d 789, 791 (Tex. Civ.App.—Beaumont 1972, writ ref'd n.r.e.); nevertheless, where a party seeks dismissal of a case by asserting that the trial court lacks jurisdiction to adjudicate it, the party seeking dismissal has the burden of proof. *Southwestern Apparel, Inc. v. Bullock,* 598 S.W.2d 702, 704 (Tex.Civ.App.—Austin 1980, no writ).

■ In this case, the parties correctly agree that a Texas court does not have the authority to adjudicate title to realty situated in another state. *Holt v. Guerguin,* 106 Tex. 185, 163 S.W. 10, 12 (1914). The issue then revolves over the question of whether the Hooker Gas Plant gas-gathering system is realty or personalty. As the property in question is situated in the State of Oklahoma, we will look to that state's law for guidance in the disposition of this case.

The question of whether a gas-gathering pipeline is personal property rather than a fixture appurtenant to realty, and thus realty, was recently before the appellate court of Oklahoma in *Waterford Energy, Inc. v. Okla-*

---

**6.** The 1993 Amendment required that the price be determined, on a monthly basis, by the price index reported by *"Inside F.E.R.C.'s Gas Market*

*Report."* During the first six months of 1993, that price varied from $1.91 per MMBTU in January 1993 to $1.80 per MMBTU in June 1993.

*homa Tax Comm'n,* 845 P.2d 198 (Okla.Ct. App.1992). There, the tax commission sought to assess a sales tax on the sale of a gas-gathering system which was part of a larger transaction involving oil and gas wells, rights of way, easements and machinery. The commission contended the pipeline was personal property and thus subject to the sales tax. Waterford, on the other hand, contended that the pipeline was a buried fixture appurtenant to the realty and therefore exempt from the sales tax. The appellate court, in disagreeing with Waterford, applied the three part test long recognized in Oklahoma to determine the character of such property. That test, also recognized in the federal bankruptcy courts, consists of the following elements:

1. The actual or constructive annexation of the item to realty or to something appurtenant to that realty;

2. The appropriateness of the particular article's use to the purpose or actual use of the realty; and,

3. The intention of the party placing the article on the realty to make the article a permanent and integral part of that realty.[7]

■ The court recognized that, while Waterford met the first test, it did not meet the second test because the pipeline only benefitted the company owning the right of way (easement), and not the surface owner. *Id.* at 200 (*citing Cherokee Pipe Line Co. v. Newman,* 593 P.2d 90, 92 (Okla.1979) (Where pipe was installed underground to benefit the pipeline company's predecessor, merely for the purpose of its trade and not to enhance the landowner's property, pipeline company which owned the pipe was entitled to remove it from the realty without regard to title to an easement over the property.) Intent of the parties affixing the item to the land is the recognized controlling consideration and chief test. *Kay County Gas Co. v. Bryant,* 135 Okl. 135, 276 P. 218, 223 (1928). In holding that a pump station that had been connected to gas-gathering pipelines had not become part of the realty, the *Kay County*

court first enunciated the three part test above mentioned. The court reasoned that the gas company, in installing the structures, had not sought to improve the landowner's farm, but had installed the property to carry out its own particular enterprise. Intention of the parties in such cases was said to be the controlling matter. *Id.* at 223. Accordingly, the *Waterford* court found that the pipeline was tangible personal property. *Waterford Energy,* 845 P.2d at 200.

Appellee argues that the 1986 assignment assigned to appellee title to various easements, rights of way and pipeline, among other interests, including the gas-gathering system pipelines buried in the easements. The assignment, however, mentions that the assignor only owns an undivided 20% working interest in the leasehold, being the same interests conveyed to it by D.G.C. (D.G.C. had first conveyed to D.G.P.C., and D.G.P.C then conveyed to D.M.L.P.), and that it was this interest it was assigning to appellee, together with the interests in the wells, equipment, and fixtures located on and used "in the operation of the wells." The assignment made no reference to the gas-gathering system, the processing plant nor the easements upon or in which they were located. The gas-gathering system and the processing plant are not used in the "operation of the wells," but rather to gather and process the gas prior to delivery to Natural. Even if appellee owned the easements, this would not necessarily give it title to the gas-gathering system or the processing plant.

In *Cherokee,* the pipeline company sought to enjoin a landowner from preventing it from removing a pipeline it had buried in its easement. The landowner claimed the easement was void and unenforceable and, therefore, the pipeline company could not come upon their property to remove the pipeline. The court stated that there were actually two title issues in dispute: title to the easement and title to the pipe. As the pipeline was installed for no other purpose than to benefit the pipeline company's predecessor's trade, and not for enhancing the landowner's prop-

---

**7.** *In re K & A Servicing, Inc.,* 47 B.R. 807, 812 (Bankr.N.D.Texas 1985) (In examining and applying Oklahoma law, court finds Oklahoma courts have consistently characterized pipeline utilized to transport oil and gas as chattel.)

erty, the court found that the pipeline company had paramount title to the pipe and the right to possession of the pipe (and right to remove it), irrespective of title to the easement. *Cherokee*, 593 P.2d at 92. This is so because an easement is merely a right to make use of another's land for some definite and limited purpose. *Bonner v. Oklahoma Rock Corp.*, 863 P.2d 1176, 1181 (Okla.1993). The leasehold working interest merely gave appellee a right to search for and reduce to possession any hydrocarbons which might be found on the leased property. *Id.* at 1185.

Appellee also refers us to an Oklahoma District Court decision[8] which apparently found that when D.M.L.P. executed the assignment in 1986, it made no reservation nor included any exception so as to indicate that neither the gas-gathering system nor the processing plant were included in the conveyance. That court then found that, according to Oklahoma law, any property not reserved out of the conveyance was included in the sale. Even if that is true, however, the only intended conveyance from D.M.L.P. to appellee was an undivided 20% working interest in the properties, not 100%. Appellee concedes that when the 80% working interest was conveyed to it by D.G.C., neither the gas-gathering system nor the plant were included. That is why they entered into the Processing Agreement. Accordingly, we do not understand how an undivided 20% working interest could include 100% of the gas-gathering system and the plant. Appellee also contends that, here, the trial court deferred to the Oklahoma district court case and properly dismissed this claim on the basis of comity. The dismissal order does not make that statement. If the dismissal was on the basis of comity, then the court erred because there are two separate titles involved, title to the easement and title to the gas-gathering system. *Cherokee*, 593 P.2d at 91.

Appellee also contends that it is impossible to adjudicate title to the pipelines without adjudicating title to the easements where the pipeline lies. This is so, it contends, because there is no authority to lay, construct, or maintain pipelines in the absence of ownership of the easements and rights of way. We disagree. *See Hinds v. Phillips Petroleum Co.*, 591 P.2d 697, 698–99 (Okla.1979). *Hinds* involved a trespass action in which the plaintiff charged defendant with an unauthorized construction of a pipeline. The lessee had entered into a contract to sell and deliver casinghead gas at the wellhead on the lease premises. The court held that, by making such a contract, the lessee effectively transferred to the third party the lessee's lease-granted right of way to lay its pipelines on the demised land. There was no express written conveyance of an easement, but it was implied by the contract of sale. Therefore, when appellee contracted to have its gas processed, it would have impliedly given the processor, if it did not already have, its lease-granted right of way to lay its gas-gathering system and processing plants. Accordingly, adjudicating title to the easement is not necessarily determinative of title to the gas-gathering system. *Cherokee*, 593 P.2d at 92.

There is no question but that the Hooker Gas Plant gas-gathering system was installed for the sole purpose of gathering and processing the gas being produced from the gas field in question. Oklahoma law classifies that type of property as being personal property. The trial court, therefore, had jurisdictional authority to adjudicate this controversy and it erred in dismissing appellants' claim for want of subject matter jurisdiction.

Accordingly, we sustain appellants' first point of error and remand this issue to the trial court for trial on the merits.

▪ Appellants, in their second point of error, contend that the trial court erred in dismissing its processing rights claim for lack of subject matter jurisdiction because the issue concerned a contract right pertaining to personal property. Appellants contend that the rights to process were reserved in the 1982 Assignment from D.G.P.C. to D.G.C., and that it succeeded to those rights as D.G.P.C.'s successor. Appellants further

---

8. Appellee also filed other suits in Oklahoma concerning these properties. The case referred to us here is C–93–6, Dorchester Hugoton, Ltd. v. Dorchester Master Limited Partnership, Parker & Parsley Gas Processing Co., Parker & Parsley Development Company and Midland Gas Processing Co., filed in the District Court of Texas County, Oklahoma.

contend that once gas is extracted from the ground, it becomes personal property and the right to process it is an interest in personal property. Appellee, on the other hand, contends that the right to process is but one of a cluster of rights comprised within an oil and gas lease which represents an interest in land. As such, determining title to the right to process claim would necessarily involve the determination of title to real property. Since the real property is in Oklahoma, appellee contends, the trial court had no jurisdiction to adjudicate this issue.

■■■■ In reviewing dismissal of the claim to ownership of the rights to process because of a lack of subject matter jurisdiction, we will construe appellants' pleadings setting forth such claim as true. *City of McAllen*, 869 S.W.2d at 560. Appellee cites us to the Oklahoma Supreme Court cases which have held that an oil and gas lease is comprised of a "cluster of rights" which includes a great variety of common-law interests in land. Whatever the name used for any such interest, the interest represented is one in land. *Hinds*, 591 P.2d at 698; *Shields v. Moffitt*, 683 P.2d 530, 532 (Okla.1984). *Hinds* has been discussed above. *Shields* involved the question of whether violation of a clause in an oil and gas lease which allowed assignment only with lessor's written permission created a forfeiture. That case is distinguishable because that case dealt with the interpretation of the lease on how it affected an interest or estate in realty.

■■■ Pipelines and gas-gathering systems might also be classified as hybrid offsprings arising out of those cluster of rights comprised within oil and gas leases. Those items of property, however, have been classified as personal property. *K. & A. Servicing*, 47 B.R. at 812; *Waterford Energy*, 845 P.2d at 200 (pipeline utilized to transport oil and gas characterized as chattel). Oklahoma also holds that oil and gas, once produced and reduced to possession, becomes personal property. *Replogle v. Indian Territory Illuminating Oil Co.*, 193 Okla. 361, 143 P.2d 1002, 1007 (1943) (Oil and gas in its natural state is regarded as not susceptible of ownership in place apart from the land; but when it is produced and reduced to possession it

becomes personal property.) Therefore, it appears that an oil and gas lease in Oklahoma encompasses some properties which may be classified as estates in realty and gives birth to others which may be classified as personal property.

Accordingly, we find that the issue involving ownership of the rights to process the gas in question did not require determination of title to real property in Oklahoma. Appellants could not engage in any processing of the minerals until they were extracted from the ground by appellee. Thus, the issue involved one concerning contract rights affecting personal property and was, therefore, within the jurisdiction of the trial court to adjudicate. We, therefore, sustain appellants' point of error number two, reverse the judgment of the trial court, and remand this issue for further proceedings consistent with this opinion.

■■■ We now turn to appellee's cross-points of error. Appellee contends in its first cross-point that the trial court erred when it granted appellants' partial summary judgment which effectively held that the June 16, 1982 Gas Processing Agreement (the Agreement) was terminated by the January 1, 1993 Amendment. Appellee further contends that such interpretation of the Agreement and the Amendment is incorrect.

■■■■ In reviewing a motion for summary judgment, the courts are governed by the following standards:

1. Movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law;

2. In deciding whether there is a disputed material fact issue precluding summary judgment, we will accept all evidence favorable to the non-movant as true;

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Nixon v. Mr. Property Management Co., Inc.*, 690 S.W.2d 546, 548–49 (Tex.1985). In the interpretation of contracts, the primary concern is to ascertain and give effect to the intentions of the parties as expressed in the

instrument. *Citizens Nat'l Bank v. Texas & Pac. Ry. Co.*, 136 Tex. 333, 150 S.W.2d 1003, 1006 (1941). The entire instrument must be examined and considered so that none of the provisions are rendered meaningless. *R. & P. Enters. v. LaGuarta, Gavrel & Kirk*, 596 S.W.2d 517, 519 (Tex.1980). The question whether a contract is ambiguous is for the court. *Id.* at 518. Where an instrument is so worded that a court may give it a certain or definite legal meaning or interpretation, it is not ambiguous. *Id.* at 519. Where the instrument is susceptible to more than one meaning, extraneous evidence is admissible to determine the true meaning of the instrument. In such instances, however, summary judgment is improper. *Id.*

The 1982 Gas Processing Agreement was entered into by companies of the same corporate family, and thus it was to their advantage to make agreements which would benefit each other. When the Agreement was entered into, these companies, D.G.C., D.G.P.C. and appellee, were aware that the price of gas under the Contract remained subject to increases in the Federal Energy Regulatory Commission minimum rate regulations. Because the cost for fuel and shrinkage was tied in to the price Natural paid for its gas, the remaining 20% working interest was assigned to D.G.P.C. so it could recoup increased costs. When D.M.L.P. succeeded D.G.P.C., it took this benefit. Additionally, when D.M.L.P. succeeded D.G.P.C., it was aware that the Agreement required it to process appellee's gas, deliver it to Natural, and pay for fuel and shrinkage according to the pricing mechanism and other terms set out in the Contract, **as amended.** That is, as it stood on that day. In addition to the termination clause above cited, the Agreement also provided, by Paragraph 10 thereof, that the Processor could terminate the Agreement whenever it became unprofitable to continue operations. Appellants then succeeded D.M.L.P. with all of these conditions in place.

Appellee's lawsuit against Natural for cancellation of the Contract understandably concerned D.M.L.P. because it knew that any changes in the pricing mechanism could adversely affect the price they would have to pay for fuel and shrinkage. Accordingly,

D.M.L.P. initially sided with Natural in attempting to prevent cancellation of the Contract. Appellee's goal was to increase the price of gas, either by cancellation of the 1946 Contract and entering into a new contract, or the next best thing, amending the 1946 Contract so as to increase the price of gas. Either way, their goal would be accomplished. Therefore, when appellee and Natural settled and agreed to the 1993 Amendment, appellants took the position that such an amendment was a change in the terms of the Contract, and that it triggered the termination clause set out above. Appellee contends, however, that the clause in question does not terminate the Agreement based on a change in the gas pricing mechanism under the Contract because the Agreement already provided for appellant to terminate the Agreement in the event the operation proved unprofitable. We disagree.

■ The Agreement, without the 1993 Amendment, provided two methods by which it could be terminated. One, Paragraph 9, provided the Agreement would continue until the terms of the Contract changed; and the other, Paragraph 10, if in the Processor's opinion the operation proved to be unprofitable. Paragraph 9 allowed the Agreement to continue "[s]o long as gas covered hereby is delivered by Owner under terms of the Gas Purchase Contract as amended." When D.M.L.P., appellants' predecessor, took over the obligations of the agreement, it did so under the terms of the amended contract as it existed on the date of the assumption. The clauses are clear and unambiguous. We believe that the intent of the parties was to provide two alternatives for the processor to terminate the Agreement, one being dependent on what occurred to the Gas Purchase Contract and the other dependent on the operation becoming unprofitable. Although the Contract and the Agreement were executed separately, they are construed together because, according to the Agreement, it was the intent of the parties that the Contract provide the mechanism that determined the price that the processor would have to pay for fuel and shrinkage. *Guadalupe–Blanco River Auth. v. City of San Antonio*, 145 Tex. 611, 200 S.W.2d 989, 1002 (1947)

(Where City entered into a lease with G.–B.R.A., and separately into an indenture with bond buyers for the purpose of closing a transaction, instruments were construed together because the lease referred to the indenture which required G.–B.R.A. to execute the lease so City could issue the bonds.)

Appellee also contends that appellants are collaterally estopped from asserting this argument because the issue of whether an amendment to the Contract automatically terminates the Agreement has already been litigated in Oklahoma in the C–87–129 proceeding.[9] We do not agree. The Oklahoma litigation in that proceeding arose after appellee and Natural entered into a 1987 amendment to the Contract which allowed Natural to release a certain amount of gas so that appellee could sell it on the spot market to a company named Mid–Con Marketing Corp. There, appellants contended that under the Processing Agreement they were not required to process gas that was to be sold to a party other than Natural. The Oklahoma trial court agreed and determined that the Contract was the foundation of the Agreement, that both were valid instruments, and that the Processing Agreement did not cover spot sales to third parties. Accordingly, it ordered appellee to deliver to appellants all gas produced, and it further ordered appellants to process said gas, deliver it to Natural, and pay appellee for fuel and shrinkage at the rate of Natural's price, all pursuant to the terms of the Contract. The Oklahoma court's decision, which preceded the execution and effective date of the 1993 Amendment by more than four years, involved no determination relevant to whether the 1993 Amendment terminated the Processing Agreement.

Appellee also contends that the trial court, by ruling in favor of appellants, in effect made Paragraph 10 meaningless. Again, we do not agree. Paragraph 9 allows the Agreement to continue in effect so long as gas covered by the Contract is delivered under the terms of the Contract. There-fore, a significant change in the terms of gas delivery under the Contract would presumably give appellant the option to invoke the provisions of Paragraph 9 and immediately terminate the Agreement without notice. Paragraph 10, on the other hand, is not dependent on nor does it refer to the Contract. Termination under Paragraph 10 is an option for appellants to exercise and requires a 180 day notice by the processor to the Owner of its "intention to discontinue operation of the plant" if continued operation proves to be unprofitable. It also gives the Owner an additional 90 days in which to elect to purchase all or a portion of the plant. Each paragraph provides for different occurrences, stands alone, and, therefore, is neither incompatible nor meaningless.

Appellee further contends that the pricing clause in the Contract provided for monthly automatic amendments affecting the pricing without causing the Agreement's automatic termination. Accordingly, appellee contends, the contracts should be construed from a utilitarian standpoint bearing in mind the particular business activity sought to be served. Citing *United Gas Pipe Line v. Mueller Eng.*, 809 S.W.2d 597, 602 (Tex. App.—Corpus Christi 1991, writ denied). We do. When the spin off took place in 1982, appellee, D.G.P.C., and their parent corporation were aware that the price for gas delivered under the Contract was determined by the Natural Gas Policy Act of 1978, which figure changed almost on a monthly basis. This was something that was already in effect when the spinoff occurred, and under those circumstances, that amendment would not trigger the automatic termination clause. Further, it is clear that control of the pricing was being left to an independent, neutral third party. The situation is different here. Here, two of the three affected parties are the ones making a change in the pricing terms of the Contract. Clearly that was not the intent of the parties when the instruments were drawn up. Therefore, because

---

9. As stated previously, these parties have also been litigating in Oklahoma. The case referred to by appellees in support of their collateral estoppel argument is Cause No. C–87–129, styled *Dorchester Hugoton, Ltd. v. Dorchester Master Limited Partnership and Damson Oil Corporation,* filed in the First Judicial District, Texas County, Oklahoma. The judgment in that case was signed on October 31, 1988.

we do not believe the Contract and the Agreement ambiguous, we will enforce them as they are written. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981). Like the Oklahoma district court in the C–87–129 case, we also hold that the Contract is the foundation of the Agreement, and when appellee ceased delivering gas to Natural under the terms of the Contract as amended, the Agreement became subject to termination.

Accordingly, we overrule appellee's crosspoint of error number one.

We take up appellee's cross-points of error numbers two, three and four together because they involve overextraction claims for breach of the Agreement and for an assignment of damages under the Contract and Agreement or, alternatively, for unjust enrichment. The trial court ruled in its summary judgment that appellants had no liability to appellee on its overextraction claims and that it was not entitled to any damages on the unjust enrichment claim.

When D.G.P.C. was still processing appellee's gas, James E. Raley was its president, having served in that capacity from May 1980 to April 1984. Subsequently, Mr. Raley left and later became associated with appellee as president of one of its limited partners. By reason of his association with appellee, Mr. Raley assisted appellee with its discovery and in the settlement negotiations with Natural. As another part of its settlement with appellee, Natural also assigned to appellee certain claims for overextraction of BTU content. The part of the settlement which assigned the overextraction claim is contained in the following paragraph:

"1. Any rights of Assignor accruing on or before January 1, 1993 under that certain **gas purchase contract between Assignor and Harrington & Marsh (Sellers)** dated as of December 1, 1946, as amended (Contract), directly resulting from the failure of Sellers at any and all times prior to January 1, 1993 to comply with the obligations under Paragraph 3(d) of Article Fifth of

the Contract to refrain from permanently removing hydrocarbons from the total gas stream to the extent necessary to assure that the gas stream after such removal shall contain not less than 75% of the BTU's contained in the total gas stream entering Sellers' natural gasoline plant." (emphasis added)

The assignment purportedly assigned all overextraction claims since adoption of an amendment to the Contract in 1976 through December 31, 1992, including the period of time that Mr. Raley ran D.G.P.C. During settlement negotiations, with Mr. Raley assisting appellee, Natural was informed about the possible overextraction claim and was convinced to assign it to appellee as part of the settlement agreement. Appellants denied liability for the overextraction claim on the basis that it was not a party to the Gas Purchase Contract nor the Seller thereunder, that appellee had previously admitted that, as the Seller under the Contract, it had complied with the provisions of the 1976 Amendment.[10] Appellants also claimed that appellee had suffered no damages and that the assignment was vague because it only assigned claims arising under the gas purchase contract and not the processing agreement. The claims that Natural assigned to appellee were those accruing prior to January 1, 1993, under that certain **"gas purchase contract"** between Assignor and Sellers (appellee). The 1976 Seller under the Contract had entered into a permanent agreement with Natural, the 1976 amendment to the Contract, whereby they agreed to not remove more than 25% of the BTU's contained in the gas stream. This 1976 amendment was a part of the Contract as amended that was assigned to appellee in 1982. Then, during the pendency of appellee's suit against Natural, appellee, in responding to Natural's discovery requests, admitted that it had complied with the terms and conditions of the 1976 amendment. That is, that it had not breached the Contract by extracting more than 25% of the BTU's con-

**10.** Natural's Request for Admission No. 51 to appellee was the following:

Admit that Dorchester has complied with the terms and conditions of the 1976 amendment, Exhibit G to these Requests for Admissions.
 Appellee's Response: Admit

tained in the gas stream. This admission is dated **July 3, 1991.** Appellee settled with Natural on December 2, 1992. When appellants pointed out that there had been no breach of contract because appellee, as the seller under the Contract, had admitted that it had complied with the 1976 amendment, appellee contends that it then discovered that it had mistakenly admitted the request for admission. With leave of court, appellee amended its response in which it now admitted that it was not in compliance with the terms and conditions of the 1976 amendment because the Processor had failed to limit its extraction of BTU's as required under the 1976 Amendment. This amended response was made on **May 25, 1993,** more than six months after its settlement with Natural. On July 1, 1993, with leave of court obtained, appellee amended the affidavit of James E. Raley which had been filed in support of its response to appellants' motion for partial summary judgment. The purpose of amending the affidavit was to correct the fact that Mr. Raley began assisting appellee in its discovery process in *September of 1990 and not after September 1991* as had previously been stated, and to justify their amended response to the request for admission of May 25, 1993. According to appellee's motion, the corrected affidavit was to read as follows:

19. "I became involved in the discovery process in the instant lawsuit after September 1990. After I became involved in the discovery process of the instant lawsuit, I was unaware that Dorchester Hugoton, Ltd. had stated in any discovery responses that it was not in breach of the 1976 Amendment to the 1946 Contract until May 20, 1993."

Appellee's position is somewhat confusing. If Mr. Raley was involved in the discovery process on appellee's behalf in September 1990, and was previously aware of overextraction, then how could appellee have been mistaken over its admission filed on July 3, 1991? Raley was already on board and helping with discovery when the admissions were made.

 Appellee apparently concedes that appellants have no liability under the Contract because they are not parties to it.

*Major Invs., Inc. v. De Castillo,* 673 S.W.2d 276, 279 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.) (Privity of contract is an essential element of recovery on an action based upon a contract.) Appellee contends, however, that appellants violated the Agreement by overextracting BTU's, and this put appellee in a position of having violated the Contract with Natural and exposed appellee to damages, all of which were assigned to it by Natural. Appellee contends it can now sue for such breach and attendant damages as a third party beneficiary. This argument has no merit. In order for appellee to prevail on this theory, it must plead and prove that a cause of action capable of being assigned existed and was assigned to it. *Pape Equip. Co. v. I.C.S., Inc.,* 737 S.W.2d 397, 399 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). The assignment here does not mention any violation of the processing agreement nor does it speak of any cause of action existing against appellants. The purported assignment assigns "rights" accruing to Assignor under the **gas purchase contract.** The only party to this lawsuit having any obligations under the Contract is appellee, and the only breach of the Contract mentioned in the assignment is attributable to appellee by its own admission. It appears, therefore, that the assignment is actually forbearance of a claim Natural might have had against appellee. Alternatively, appellee contends that it is entitled to recover under a third party beneficiary theory. Citing *Cumis Ins. Soc'y, Inc. v. Republic Nat'l Bank,* 480 S.W.2d 762, 767 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.). As mentioned above, however, the assignment makes no reference to any of appellants' duties or obligations under the Agreement. Perhaps Natural might have had a cause of action against appellants as third party beneficiaries under the Agreement. But if they did, that cause of action was not contained in the assignment in question.

Appellee also contends that appellants' motion for summary judgment did not address their direct claim for breach of the Agreement. We disagree. In their motion for summary judgment on the overextraction claims, appellants asserted that Natural re-

leased appellee from any claim for overextraction damages. Based on the summary judgment evidence discussed above, the trial court agreed with appellants' assertion, and we are affirming the court's decision on that matter. The determination that Natural released all overextraction claims against appellee disposed of appellee's overextraction claim under the Agreement. *Cf. Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 689 (Tex.1981) (proper award of damages for breach of collateral contract should not allow double recovery or unjust enrichment, citing *Smith v. Nesbitt*, 111 Tex. 186, 230 S.W. 976, 977–78 (1921)).

Finally, appellee complains that appellants' motion for summary judgment on unjust enrichment and Mcf imbalance claims did not assert that appellee suffered no damages or that existence of an express contract precluded any claim for unjust enrichment. Again, we disagree. In the motion complained of, appellants addressed the damages claim by citing to the court appellee's responses to interrogatories in which they admitted that neither Natural nor it suffered any damages due to Mcf or BTU imbalances. At any rate, when the court found that no liability attached to appellants under the Contract, that, in effect, disposed of all claims for damages.

Accordingly, we find that the trial court did not err in finding there was no liability to appellee under the purported assignment and, consequently, appellants were not liable to them for damages or unjust enrichment. We overrule appellee's cross-points of error numbers two, three and four.

In its cross-points of error five through nine, appellee complains of the award of attorney fees to appellants because appellants' testimony should have been excluded as a sanction for violation of the discovery rules. TEX.R.CIV.P. 166b(6) and 215(5). Appellee agrees that appellants timely provided the billing statements and expert witnesses who were to testify that all fees incurred were reasonable and necessary. Then, appellants, within thirty days prior to the final hearing, presented to appellee a form of judgment showing a lesser amount of attorney fees with an allocation of attorney fees to particular causes of actions. Appellee claims that appellants' supplementing responses did not state that an allocation of fees would be made or that the amount to be claimed was less than that previously disclosed. Appellee further contended that to allow testimony on the allocation of fees would allow appellants to testify on a theory or opinion not previously disclosed. They further objected to testimony concerning attorney fees on appeal because those had not been disclosed in response to interrogatories. Appellee made timely objections to the testimony and sought its exclusion, all of which were overruled.

A party who fails to properly answer discovery requests should not be allowed to offer the testimony which was omitted in the response, absent the showing of good cause. *Gutierrez v. Dallas Indep. Sch. Dist.*, 729 S.W.2d 691, 693 (Tex.1987). The salutary purpose of Rule 215(5) is to require complete responses to discovery so as to promote responsible assessment of settlement and prevent trial by ambush. *Alvarado v. Farah Mfg. Co., Inc.*, 830 S.W.2d 911, 914 (Tex.1992). Experts must be fully disclosed, including the subject matter of their testimony, their mental impressions and opinions, and facts known to them that relate to or form the basis of those mental impressions and opinions. TEX.R.CIV.P. 166b(2)(e)(1).

Appellee concedes that appellants, more than thirty days before the hearing, disclosed billing statements for the total amount of attorneys' fees incurred in the entire litigation. They then supplemented their responses and disclosed the expert witnesses that were to be called on the issue of attorney fees and their mental impressions, which were stated to be as follows:

> All attorneys' fees incurred by Plaintiffs' in the course of this litigation are reasonable, necessary and appropriate considering the complexity of the issues in this lawsuit. Messrs. Donley, Nettles and Lipscombe rely upon their knowledge of this lawsuit and the legal fees incurred by Plaintiffs in this lawsuit.

Appellants, therefore, disclosed that "all attorneys' fees incurred" were reasonable, necessary and appropriate. The billing statements should have reflected the work attributed to the various phases of the litigation. We find the response to be adequate and the fact that appellants chose to lower their claim by allocating only a portion of their total fees to those claims in which they had prevailed was not harmful to appellee.

■ Appellants, however, only disclosed that their expert witnesses would testify as to attorney fees "incurred." Their response did not disclose that the experts would testify concerning attorney fees on appeal. Since this was not disclosed, testimony should have been limited to attorney fees incurred.

Accordingly, we overrule appellee's cross-points five through nine regarding the $200,-000 in attorney fees awarded and affirm that portion of the trial court's judgment. As applied to the attorney fees awarded in the event of an appeal to this court or to the Texas Supreme Court, however, we sustain appellee's cross-points five through seven. We reverse that part of the judgment and render judgment that appellants take nothing on their claim for attorney fees in the event of appeal.

In summary, we REVERSE the trial court's dismissal of 1) appellants' claim to ownership of the Hooker Gas Plant gas-gathering system and 2) appellants' processing rights claim. We REMAND those claims to the trial court for trial on the merits. We AFFIRM the trial court's summary judgment 1) declaring that the 1982 gas processing agreement between appellants and appellee was effectively terminated on January 1, 1993, 2) finding that appellants were not liable to appellee either for overextraction under the contract or for unjust enrichment, and 3) awarding appellants $200,000 in attorney fees incurred through trial. However, we REVERSE the trial court's award of attorney fees in the event of appeal and RENDER that appellants take nothing on their claim for appellate attorney fees.

