CONSOLIDATED GAS, ELECTRIC LIGHT & POWER COMPANY *v.* WILLIAM A. RYAN ET AL.

[No. 44, October Term, 1933.]

*Decided January 9th, 1934.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*Benjamin Chambers* and *Paul S. Clarkson,* with whom was *Edwin M. Sturtevant* on the brief, for the appellant.

*Edward L. Ward,* with whom was *Edwin W. Wells* on the brief, for the appellees.

PATTISON, J., delivered the opinion of the Court.

The McNamara Brothers Company, a corporation, was the owner of a lot of land on Kloman Street in Westport, Baltimore, upon which they had, in 1918, erected a building of structural steel, covered in part by corrugated iron to be used in the business of constructing heavy steel plates and tanks. In the use of the building for the purposes stated, hoisting machines of some character were necessary to raise heavy objects and material from the floor and move it to other parts of the building. Until 1919 jib cranes attached to the vertical beams or columns at the sides of the building were used. There were twenty of these columns. Late in 1919 McNamara Brothers Company ceased to use the jib cranes and installed an electric traveling crane weighing 31,000 pounds, and capable of hoisting material weighing ten tons.

The crane was made up of two component parts—the bridge of the crane and the carriage. The bridge consisted of two heavy parallel girders running across the width of the building. Mounted on each end of this bridge construction were two double flanged wheels which fit in the track or crane rails, which in turn rested upon longitudinal beams in the building. The crane carriage was mounted on the bridge and could be moved along the bridge across the building. The carriage contained the hoist mechanism. The crane was powered by three 3-phase, 25-cycle, alternating current electric motors. The bridge motor propelled the crane along the rails or track up and down the length of the building; the trolley motor moved the crane carriage, from which the hook was suspended, along the bridge of the crane; and the third or hoist motor raised and lowered the hook with its load. The crane was constructed in this manner so that it was possible to pick up a load in any part of the building and carry it to any other place in the entire length or breadth of the building.

The longitudinal beams on each side of the building upon which the track rails rested and were fastened were placed in the building when it was first erected. In addition to the use which was thereafter made of them in the installation and operation of the crane, they also served to strengthen the building, and were attached to the beams or columns which supported them and formed part of the building itself.

On April 16th, 1924, McNamara Brothers Company executed a mortgage on said land and improvements to the Guardian Building Association of Baltimore, to secure the payment of $21,840. The property conveyed by the mortgage was described as "all that lot of ground situated and lying in Westport, in Baltimore City * * * together with the improvements thereon, the rights and appurtenances thereunto belonging or appertaining".

In 1926 the McNamara Brothers Company erected an addition to the building of the same size as the original building. In doing so the track rails were extended to the

full length of the enlarged building, so as to extend the operation of the crane to the entire building.

On June 22nd, 1928, the building association loaned McNamara Brothers Company $10,400 additional, and took a second mortgage upon the property; it being the property described in the former mortgage.

On June 28th, 1928, McNamara Brothers Company borrowed $8,000 from William A. Ryan, one of the appellees, and to secure such loan the company executed to Ryan a mortgage conveying not only the property mentioned and described in the two mortgages given to the Guardian Building Association, but also "the plant machinery and equipment, situated in and upon said lot of ground," specifically naming the various pieces of machinery so conveyed, including "one ten-ton crane," which is the crane mentioned in these proceedings.

In 1932 McNamara Brothers Company defaulted under its mortgages to the building association and to Ryan.

On April 1st, 1932, a decree of foreclosure upon the building association mortgage, dated April 16th, 1924, was granted, and on the next day a decree was passed by the same court upon the Ryan mortgage. The property embraced in the building association mortgage was offered at public sale at 3 P. M., April 26th, 1932, and was bought in by the association. At 3.15 P. M. on the same day, and at the same place, the trustee named under the decree of foreclosure of the Ryan mortgage sold the machinery and equipment, including the crane. This sale was duly reported to the court and after the expiration of the time named in the *nisi* order it was finally ratified and confirmed.

On July 13th, 1932, after final ratification and confirmation of the sale made to the building association, the latter sold and conveyed the property bought by it unto the Consolidated Gas, Electric Light & Power Company of Baltimore, the appellant in this case.

Upon being told by Robert J. McNamara, that he, the agent of the purchaser under the Ryan mortgage, intended to remove the crane from the building, the appellant filed its

bill for an injunction, asking that Robert J. McNamara be restrained from so doing. The court ordered an injunction to issue as prayed unless cause to the contrary be shown on or before the time named therein. The defendant Robert J. McNamara answered the bill, averring therein that the electric crane mentioned is not a fixture and not a part of the building, but is a personal chattel to which Ryan as purchaser had acquired title under the foreclosure proceedings; that Ryan did not claim the steel tracks upon which the electric crane is operated. These rested upon and were fastened to the longitudinal beams which formed a part of the structure of the building. In addition, the answer averred that the damages, if any, caused by the removal of the crane, would be susceptible of definite and adequate compensation, and that the court was without jurisdiction to determine the ownership and title of it until that question was first determined in an action at law; and because of such want of jurisdiction in the equity court, Ryan had instituted an action at law which was then pending.

At this juncture in the proceedings, the parties entered into a written stipulation by which it was agreed that "the title to the electric traveling crane, which is the subject matter of this proceeding, shall be fully and finally heard and determined at the hearing of this cause"; and that the determination so reached "shall be binding and conclusive upon the parties to this cause, independent and exclusive of any common law action instituted to determine said title," reserving, however, the right to appeal from the final decree passed in these proceedings. It was also agreed that William A. Ryan would "dismiss his suit in trover against the Consolidated Gas Electric Light and Power Company of Baltimore" and that by "appropriate petition addressed to this Court" he should be made a party defendant in this cause.

As suggested, a petition was filed and Ryan was made a party defendant "with leave to assert and prosecute his rights as such defendant and with leave to adopt the allegations and averments in the answer of Robert J. McNamara,

defendant, filed herein as his answer to the bill of complaint".

It was also orally stipulated by counsel for the respective parties that the "McNamara Brothers Company was engaged in the manufacture of heavy steel boilers and tanks and other heavy steel equipment of various kinds prior to the foreclosure of the mortgages mentioned in the complainant's bill, and that the appellant is now using these premises for the storage of large and heavy equipment, the handling of which is facilitated by the crane, and also for the storage of large supplies such as boiler tubes and creosoted lumber".

The case was heard by the court, and at the conclusion of the evidence a decree was passed on March 11th, 1933, by which it was "ordered and decreed, that the ten-ton Chesapeake Electric Traveling Crane is not an appurtenance and fixture of the land and improvements owned by the plaintiff in pursuance of its deed from the Guardian Building Association of Baltimore City, a corporation, dated July 13th, 1932 * * * but that the title to said Chesapeake Electric Traveling Crane is vested in and is the property of the defendant, William A. Ryan, in pursuance of the foreclosure proceedings instituted by him in this court upon a mortgage held by him specifically covering said Chesapeake Electric Traveling Crane with other chattels and personal property * * * at the public sale of which under said foreclosure proceedings the said William A. Ryan became the purchaser of said electric traveling crane, and which sale was reported to this court, and after due notice by advertisement was ratified and confirmed by this court".

It is from this decree of the court that the appeal in this case was taken. The question to be decided is: Was the electric traveling crane mentioned herein a fixture or a chattel?

The controversy here is to be determined upon the law applicable to mortgagor and mortgagee or vendor and vendee, where the rigor of the common law rule has not been relaxed as it has been in the case of landlord and tenant. *Homeseekers' Realty Co. v. Sales Corp.,* 163 Md. 546, 163 A.

841; *Dudley & Carpenter v. Hurst,* 67 Md. 44, 8 A. 901; *Bankers' & Merchants' Credit Company v. Building & Loan Assn.,* 160 Md. 234, 153 A. 64.

It would seem that the law is nowhere more hopelessly in conflict than it is upon the question of the legal character of articles in controversy between mortgagor and mortgagee as herein presented. The leading case reflecting upon the law on this subject, as now recognized in this state, is *Dudley & Hurst, supra.* There a farm, upon which the owner had established a canning factory for canning fruits, vegetables, etc., was sold under a mortgage. The mortgage, after describing the lands therein conveyed, went on to say "together with the buildings and improvements thereupon, and the rights, roadways, waters, privileges, appurtenances, and advantages thereto belonging or in any wise appertaining." Two years after the execution of this mortgage the owner of the property executed a mortgage upon the machinery in the factory. Some months thereafter, when about to sell the machinery under the mortgage, the mortgagees, upon the application of the purchasers under the first mortgage, were restrained by injunction from so doing, on the ground that the articles of machinery were fixtures and passed to them as purchasers under the first mortgage foreclosure proceedings. The court below dismissed the bill "upon the ground that complainants had an adequate remedy at law even if this machinery did belong to them." In respect to this proposition the court, speaking through Judge Stone, said: "If the machinery had really become, by annexation, actual or constructive, a part of the freehold, we entertain no doubt of the power of a court of equity to restrain and prevent its attempted severance." The court then proceeded to determine whether or not the articles of machinery were fixtures. It said:

"The term 'fixture' is generally used in reference to some originally personal chattel which has been actually or constructively affixed either to the soil itself, or some structure legally a part of such soil.

"The tests by which a fixture is determined are generally these:

"(1) Annexation to the realty, either actual or constructive;

"(2) adaptation to the use of that part of the realty with which it is connected;

"(3) the intention of the party making the annexation to make the article a permanent accession to the freehold—this intention being inferred from the nature of the article annexed, the situation of the party making the annexation, the mode of annexation, and the purpose for which it was annexed. Ewell, Fixt.; Tyler, Fixt.; Jones, Mortg."

To render a chattel a fixture there must be annexation, either actual or constructive, to the freehold.

It is said by Mr. Tiffany, in his treatise on Fixtures, 26 *Corpus Juris,* 654, 655, 658: "An intention to make a chattel a part of the realty would usually be insufficient for this purpose, unless that intention is accompanied by annexation, that is, by physical attachment or what, under the special circumstances of the case, the court regards as equivalent to physical attachment. * * * It is ordinarily stated, expressly or by implication, that annexation of a chattel to the realty is necessary in order to render it a part of the realty." *Dudley & Carpenter v. Hurst, supra; Hanson v. Vose,* 144 Minn. 264, 175 N. W. 113, 7 A. L. R. 1573, and other authorities in note thereto.

It is only when such annexation is indicated or shown to exist that the question of its adaptation to the use of that part of the realty to which it is connected, or the intention of the party making the annexation to make the article a permanent accession to the freehold, or the situation of the party making the annexation, or the mode of annexation and the purpose for which it was annexed, become factors in determining the question whether the chattel has become a fixture and forms a part of the freehold. *Dudley & Carpenter v. Hurst, supra.*

It is shown by the evidence in this case that the building

was constructed in the early part of 1918, and was used by its owners, in the manufacture of heavy steel boilers, plates, and tanks, for nearly two years without the electric crane in question. In the manufacture of those articles it was necessary to move heavy objects or material from one part of the building to another, and this gave rise to the necessity of a crane. This was the sole object of the crane, and it was not, as we understand from the evidence, in any way connected with any other machinery. For the first two years this work had been done, as we have said before, by jib cranes attached to the vertical beams on each side of the building upon which the longitudinal beams rested and were fastened. Both the vertical and longitudinal beams were made larger than was otherwise necessary, so that some time, if desired, an overhead crane could be used.

In the latter part of the year 1919, McNamara Brothers Company, owners and operators of the plant, purchased a Chesapeake electric traveling crane, which was installed by the company from which it was bought. When installed, the tracks, upon which the wheels of the crane revolved, were placed upon and fastened to the longitudinal beams. The crane itself was in no way attached either to the beams or the tracks, the latter not being claimed by the appellees. When the crane was first installed, the building was only one hundred feet in length; but in 1926 it was lengthened to two hundred feet, and the tracks on the longitudinal beams were lengthened so as to enable the crane to operate to the full extent of the building. The width of the building, before and after the extension, was fifty feet, which was the length of the crane.

The evidence is to the effect that the crane can be removed without any injury or damage to the building and at a cost not more than $150. It is contended by the appellant that the crane is not adapted to uses in any other building, unless it has the dimensions of the building in which the crane is now located. This might be true as to the width of the building, but is evidently not true as to the length, for the crane was first used in a building one-half the length

of the present building. The sole use made of the crane was to hoist and move objects and materials from different parts of the building. The crane had no peculiar adaptation to the business in which McNamara Brothers Company was engaged, as shown from the fact that it is now used in the building used for storage. The crane could be used for any business in any building in which it could be operated, wherever there was a necessity for hoisting and moving large bodies.

In *Dudley & Carpenter v. Hurst,* the court said:

"To remove the boiler and steam-pump, it would, as we have said, have been necessary to tear down the boiler-house; and to remove the process-kettles it would be necessary to tear up the whole floor of the process-room, which is the main portion of the building. The removal would destroy the piping, which was cut to fit the house. Even the kettles and tubs could not be removed through the doors, as they were put in before the building was completed. * * * That the machinery above described, and which constituted the motive power of the factory, is a fixture, and, as between mortgagor and mortgagee, passed to the latter, we think well settled. * * * That where, in the case of machinery, the principal part becomes a fixture by actual annexation to the soil, such parts of it as may be not so physically annexed, but which, if removed, would leave the principal thing unfit for use, and would not of itself, and standing alone, be well adapted for general use elsewhere, is considered constructively annexed. * * * In this case there are some articles not actually annexed to the soil, such as crates, capping-machines, and work-tables, but are essentially necessary to the working of the principal machinery, and pass by constructive annexation. The main machinery would not be in working condition without them, and they are not adapted for general purposes. We are therefore of opinion that the whole machinery of the canning factory passed under the mortgage * * * and consequently to his vendees under the mortgage sale."

In this case, the crane itself is not actually attached or annexed to the freehold, nor do we think it can be regarded as constructively attached thereto. There was no part of the machinery that had become a fixture by actual annexation to the soil, that could be regarded as a principal part of the machinery in connection with which the crane was used, and by its removal would have left such principal part of the machinery unfit for use; and the crane, of itself and standing alone, is well adapted for general use elsewhere.

The crane in our opinion remained a chattel and never became annexed to the freehold or soil, and for this reason the decree below will be affirmed.

*Decree affirmed, with costs.*