806 A.2d 648

## COLONIAL PIPELINE COMPANY

### v.

## STATE DEPARTMENT OF ASSESSMENTS AND TAXATION.

No. 110, Sept. Term, 2001.

Court of Appeals of Maryland.

Sept. 9, 2002.

Ronald Quigley (Davis, Matthews & Quigley, P.C., Atlanta, GA; Paul M. Monsees of Foley & Lardner, Washington, DC, all on brief), for appellant.

David M. Lyon, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, and William K. Hammond, Asst. Atty. Gen., on brief), Baltimore, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

HARRELL, Judge.

Colonial Pipeline Company ("Colonial"), Appellant, headquartered in Atlanta, Georgia, is engaged in the underground transport of refined petroleum between Pasadena, Texas, and Linden, New Jersey, and points in between. Part of its transportation and storage system, constructed in 1962, traverses Maryland. In its 1998 Maryland public utility property tax return, for the first time, Colonial challenged the classification as real property,[1] made by the Maryland State Depart-

---

1. Appellant initially claimed only that its pipeline and breakout tanks should be reclassified as personal property for property tax purposes. Early in the administrative appeal process regarding the 1998 assessment, Appellant broadened its reclassification claim to include its right-of-way easements. When the Maryland State Department of Assessments and Taxation ("SDAT") finally rejected its request for reclassifi-

ment of Assessments and Taxation ("SDAT"), Appellee,[2] of its operating property,[3] including its pipeline system, breakout tanks, and right-of-way easements.[4]   Although conceding that any land and buildings it owned in fee simple were assessed correctly as real property, Appellant argued that the remainder of its operating property located in Maryland should be classified as personalty.   Rejecting Appellant's request for reclassification, SDAT continued to classify Appellant's operating property as real property for purposes of its Final Notices of Assessment for the 1998 and 1999 property taxes.

On 17 March 1999, Appellant appealed to the Maryland Tax Court claiming that SDAT's assessments for 1998 and 1999 were "illegal, erroneous and improper" in their apportionment and classification of Appellant's operating property as operat-

_____

cation, Appellant expanded the temporal scope of its challenge prior to the proceedings in the Tax Court to include SDAT's assessments of its pipeline system, breakout tanks, and right-of-way easements for both 1998 and 1999.

**2.**   Although the parties' caption the case in this Court listing the Comptroller of the Treasury as Appellee, we shall refer to SDAT as Appellee throughout the opinion because the SDAT was listed as the governmental party in this matter throughout the proceedings below.

**3.**   Maryland Code (1986, 1994 Repl.Vol.), Tax Property–Article, § 1–101(u) defines "operating property," as it did at the times relevant to Appellant's challenge, as:
(1) "Operating property" means any property used to operate a railroad or public utility.
(2) "Operating property" includes operating real property and operating personal property.
(3) "Operating real property" includes any real property used to operate a railroad or public utility.
(4) "Operating land" means any land used to operate a railroad or public utility.
(5) "Operating personal property" includes any property, other than real property, used to operate a railroad or public utility."

**4.**   For purposes of this Opinion, a reference to the terms "pipeline" or "pipeline system" refers to the entire petroleum transportation system and its attachments, including the pipes in and above the ground, the pumps and pumping stations, the breakout tanks, and the right-of-way agreements.   The components are not treated separately by us for the reasons explained *infra*.

ing real property. At the conclusion of a two-day evidentiary hearing, the Tax Court rendered an oral opinion affirming SDAT's classification of Appellant's pipeline as operating real property, and declined to adjust the 1998 and 1999 final assessments. On 12 June 2000, the conclusions reached in the Tax Court's oral opinion were effectuated in a short written Order.

Relying on its understanding of the common law of fixtures, the Tax Court concluded in its oral ruling that the pipeline was intended to be a permanent addition to the real property it traversed. In reaching that conclusion, a great deal of emphasis was placed on the fact that the pipeline was buried in the ground. Being buried underground indicated to the administrative tribunal that the pipeline was constructed with the intent of not removing it and, as a result, the pipeline became a permanent part of the real property.

The Tax Court also reasoned that the great amount of time and money expended on installing the pipeline system was a further indication of Colonial's intent that it be a permanent attachment to the realty. Although concluding that the pipeline system was a fixture and should be taxed as real property, the Tax Court directed that Appellant did not have to pay increases sought by the SDAT in the 1998 and 1999 taxes previously assessed on the property based on information obtained by the SDAT in the course of the administrative appeal process.

Pursuant to Maryland Code (1986, 2001 Repl.Vol.), Tax–Property Article ("TPA"), § 14–513,[5] Appellant filed with the Circuit Court for Carroll County a petition for judicial review of the Tax Court's decision. On 21 May 2001, concluding that

---

5. The most current version of the Tax–Property Article of the Maryland Code will be cited throughout this opinion because its provisions at the time this claim arose remain substantively the same at present. Any material differences in the Article between then and now will be noted. Thus, Maryland Code (1986, 2001 Repl.Vol.), Tax–Property Article will be referred to as "TPA." TPA, § 14–513 provides that: "[a]ny party to a Maryland Tax Court proceeding may appeal a final decision of the Maryland Tax Court to the circuit court for the county in which the property is located."

the Order of the Tax Court was "based on substantial evidence and there was no erroneous application of the law," the Circuit Court for Carroll County affirmed the classification of Appellant's pipeline system as operating real property. As authorized by TPA, § 14–515,[6] Appellant then appealed the judgment of the Circuit Court to the Court of Special Appeals. On 13 December 2001, we issued a writ of certiorari on our own initiative, while the case was pending in the Court of Special Appeals, so that we might consider the following issues:

1. Whether the pipeline right-of-way easements can be equated to freehold interests in land;

2. Whether the pipeline is personal property under Maryland law;

3. Whether the classification of the pipeline as real property violates the Equal Protection Clause of the U.S. Constitution or the Uniformity Clause of Maryland's Constitution.

We shall address only an expansive version of the second issue, which is dispositive of this appeal.

## I.

The operative facts before the Tax Court are not in dispute. Appellant owns and operates an underground pipeline system, which transports petroleum across interstate lines.[7] Appellant described the nature of its business as follows:

The largest product pipeline in the world, the [Colonial] pipeline moves a daily volume of two million barrels of refined petroleum products [[8]] (the "product") from Pasa-

---

6. TPA, § 14–515 provides that: "[a]ny party to a proceeding in the circuit court under § 14–513 of this subtitle may appeal a final decision of the circuit court to the Court of Special Appeals."

7. According to Appellant's 1997 annual report, the pipeline runs between Texas and New Jersey, and in doing so, traverses Louisiana, Mississippi, Alabama, Tennessee, Georgia, South Carolina, North Carolina, Virginia, Maryland, Delaware and Pennsylvania.

8. Colonial's tariff (charge) is 2.25 cents per gallon of petroleum transported.

dena, Texas, to Linden, New Jersey, and is operated from a computerized supervisory control station in Atlanta, Georgia. The elements of the pipeline are the pipes, pumps, motors, meters, breakout tanks and the right-of-way easements. The whole pipeline is one machine; no element can function without the other elements. If a repair to the pipeline requires removal of a length of pipe, the whole line north of that point must be shut down during the course of that repair. Colonial is the sole owner of the pipeline; the landowner does not have any claim to the pipeline, the product shipped through it, or the revenue it earns.

Appellant further describes the pipeline itself:

The 36–inch mainline is 2,889 miles in length. A double mainline (one 32 inches and the other 36 inches) enters Maryland from Virginia. The 32–inch line terminates at Dorsey Junction while the 36–inch line continues north as a 30–inch line. Branching out from the mainline are smaller diameter stub lines which serve shipper terminals (such as BWI). There are four active stub lines in Maryland and two on standby status.

Breakout tanks are designed to temporarily hold some of the product as it is being transferred from the large diameter mainlines to the smaller diameter stub lines. . . . Breakout tankage is also used to take product out of the line in the event of an emergency. Located on Colonial's land at Dorsey Junction are 25 breakout tanks; two 500–barrel sump tanks and four tanks owned and operated by Kinder Morgan. . . . The breakout tanks are not attached to their foundations; their weight keeps them in place.

Appellant does not own much of the land across which its pipeline traverses, but rather enjoys numerous agreements with private landowners, other public utilities, railroad companies, and government agencies that permit Colonial limited access to and use of their land. Appellant describes the nature and extent of these agreements as follows:

For 95% of the pipeline, Colonial is the beneficiary of abutting right-of-way easements which permit Colonial to

cross over the land of other property owners and which easements grant Colonial limited rights to access the pipeline.... Other agreements allowing the operations of the pipeline include leases and licenses from railroads and utilities and permits from government agencies.

The pipeline crosses the property of 2,065 private landowners and 504 government or public utility landowners in Maryland. Under the majority of the easements from private landowners, Colonial's rights continue only so long as the pipeline is being used to transport product. Colonial does not have the right to convert the easement to any other use.

Colonial's easements are not exclusive; the landowners can and do grant easements to other utilities within Colonial's easement boundaries without Colonial's consent.

The majority of the easements from private landowners do not require Colonial to remove or relocate the pipeline. Certain permits issued by the Maryland State Highway Administration, the State Roads Commission and the Department of the Army (for river crossings) do, however, require relocation of the pipeline at the expense of Colonial.

While Colonial is the sole owner of the pipeline, the landowner is the sole owner of the land through which the pipeline runs. The landowner can use the surface of the right-of-way in a normal fashion for just about anything (e.g. parking lots, driveways, patios, crops, gardens and fences) except the construction of a building or swimming pool. In other words, the landowner continues to utilize the right-of-way for most uses so long as it does not affect the safety or interfere with the operation of the pipeline.

Permits from the Maryland Department of Natural Resources and Baltimore Gas and Electric provide that Colonial's rights may be terminated at any time. Railroads grant licenses to Colonial to cross their right-of-way that allow the railroads to require complete removal or relocation of the pipeline at the railroad's request.

The pipeline can operate for its intended use for an indefinite amount of time if it is adequately maintained. The pipeline was designed so that it may be "dug up" for removal, inspection, or repair. Each section of pipe is 40 feet in length and the pipeline is buried below the plow-line, usually 36 inches below the ground.[9] In Maryland, there are approxi-

---

9. Transportation of Hazardous Liquids by Pipeline, 49 C.F.R. § 195.248 (1998), which applies to Colonial's business, provides:

(a) Unless specifically exempted in this subpart, all pipe must be buried so that it is below the level of cultivation. Except as provided in paragraph (b) of this section, the pipe must be installed so that the cover between the top of the pipe and the ground level road bed, river bottom, or sea bottom, as applicable, complies with the following table:

| Location | Cover inches (millimeters) for Normal Excavation | Cover inches (millimeters) for rock excavation * |
|---|---|---|
| Industrial, commercial, and residential areas | 36 (914) | 30 (762) |
| Crossings of inland bodies of water with a width of at least 100 ft. (30 mm) from high water mark to high water mark | 48 (1219) | 18 (457) |
| Drainage ditches at public roads and railroads | 36 (914) | 36 (914) |
| Deepwater port safety zone | 48 (1219) | 24 (610) |
| Gulf of Mexico and its inlets and other offshore areas under water less than 12 ft. (3.7 m) deep as measured from the mean low tide | 36 (914) | 18 (457) |
| Any other areas | 30 (762) | 18 (457) |

* Rock excavation is any excavation that requires blasting or removal by equivalent means.

(b) Except for the Gulf of Mexico and its inlets, less cover than the minimum required by paragraph (a) of this section and Section 195.210 may be used if—
  (1) It is impracticable to comply with the minimum cover requirements; and
  (2) Additional protection is provided that is equivalent to the minimum required cover

mately 200 "digs," that is, excavations to relocate, verify the depth and location of, or examine the pipeline, in a given year. Over the past ten years, Appellant has removed 14,000 feet of pipe in Maryland. Removal is relatively easily accomplished without substantial damage to the real property upon which it is located. The surface of the easement is returned to its original state after any removal. When repairs are necessary, the pipeline is not usually replaced. Rather, old pipeline will be cleaned, coated, and hydrostatically tested for reuse in the system.

In accordance with TPA, § 1–101(aa–1), Appellant is classified as a public utility [10] for the purposes of Maryland property tax assessments.[11] As such, pursuant to TPA, § 8–109, all of its operating property within the State of Maryland must be appraised and assessed by SDAT.[12] As Appellee's expert witness, Laura Kittel, the Utility Valuation Supervisor for SDAT, testified before the Tax Court, the unit method of valuation is the established method used by the SDAT to

---

**10.** TPA, § 1–101(aa–1)(1) & (2) define a public utility company as:

(1) "Public utility" means a company classified by the Department as a public utility under § 8–109 of this article.
(2) "Public utility" includes:
(i) an electric company;
(ii) a gas company;
(iii) a pipeline company;
(iv) a sewage disposal company;
(v) a steam heating company;
(vi) a telephone company; and
(vii) a water company.

**11.** TPA, § 1–101(aa) provides that: "Property tax" means the property tax imposed by: (1)the State; (2) a county; or (3) a municipal corporation.

**12.** TPA, § 8–109(a) provides that:

(a) *Valuation of public utility operating property.*-The Department shall annually value the operating unit of public utility on the basis of the value of the operating property of the public utility, by considering:
(1) the earning capacity of the operating unit; and
(2) all other factors relevant to a determination of value of the operating unit.

assess the operating property of public utility accounts. This method assesses the value of a public utility's operating property, in whatever jurisdictions it may be located, as one functioning unit.[13] Once the total value of the unit has been determined, a proportionate amount of the total value is allocated to the parts of the unit located in the State of Maryland. Because real and personal property are taxed at different rates, the property of a public utility also must be assigned to one or the other category before the appropriate amount of property tax can be assessed to the utility company. All of Appellant's operating property in Maryland has been classified by SDAT as real property for property tax purposes since 1962.[14]

---

**13.** Appellant raises no challenge to SDAT's use of the unitary method of valuation to assess the value of Appellant's property for tax purposes. As such, it is unnecessary for the Court to address each component of Appellant's pipeline system because classification of the pipeline itself is representative of the classification of the other aspects of the entire pipeline system. See *infra* at pages 31–32.

**14.** Appellant points out that Maryland does not classify as real property other public utilities' operating property alleged to be similar in character or function to Appellant's operating property. For example, Colonial argues that:

> Maryland still treats the easements of the telecommunications industry and the electric industry as real property, under a longstanding practice, SDAT classifies the poles, lines and towers of cellular telephone and media cable companies as personal property. The Maryland Telecommunications Tax Return Act of 1997 reclassified telephone cable, line, poles, and towers as operating personal property. In 1999, the lines, poles, and towers of electric companies were statutorily reclassified as personal property.

Appellee rejoins that the Legislature's reason for the reclassification of the elements of the telecommunications and electric network systems is explained as:

> The General Assembly passed Chapters 629 (Senate Bill 746) and 630 (House Bill 512), Laws of Maryland 1997 to reclassify the elements of the telecommunication network system from real to personal property because of the anticipated increase in competition in the telecommunications industry. Then in Chapters 5 and 6 of the Laws of Maryland 1999, the General Assembly reclassified elements of the electric distribution network from real to personal property because of increased competition caused by the deregulation of the electric industry.... In contrast, ... Colonial's competition was the same as it had been for a long time.

## II.

### A.

We review here the decision of the Maryland Tax Court, an administrative body.[15] *Supervisor of Assessments v. Keeler*, 362 Md. 198, 207, 764 A.2d 821, 825 (2001). The applicable standard of judicial review of the final order of the Tax Court "depends on whether the court is reviewing a question of law, question of fact, or a mixed question of law and fact." *Prince George's County v. Brown*, 334 Md. 650, 658, 640 A.2d 1142, 1146 (1994). Because we consider here only questions of law, we are "under no statutory constraints [when] reversing a Tax Court order which is premised solely upon an erroneous conclusion of law." *Ramsay, Scarlett & Co. v. Comptroller of the Treasury*, 302 Md. 825, 834, 490 A.2d 1296, 1301 (1985). *See also State Dep't of Assessments and Taxation v. Consumer Programs*, 331 Md. 68, 72, 626 A.2d 360, 362 (1993)(holding that a reviewing court will reverse a decision of the Tax Court if the law is either erroneously determined or applied).

There is no dispute concerning the operative facts of this case. As noted *supra*, this appeal raises solely a question of law regarding the status of Appellant's pipeline system as

---

15. As we have noted previously, the Maryland Tax Court is not a constitutional court, but is actually a statewide administrative agency. *See Shipp v. Bevard*, 291 Md. 590, 592, 435 A.2d 1114, 1115 n. 1 (1981) (stating that the Maryland Tax Court was an administrative forum established by the Maryland Legislature as a mechanism by which taxpayers could challenge tax assessments). As such, "[t]he standard of review for Tax Court decisions are generally the same as that for other administrative agencies." *Read v. Supervisor of Assessments*, 354 Md. 383, 391, 731 A.2d 868, 872 (1999). *See Prince George's County v. Brown*, 334 Md. 650, 658, 640 A.2d 1142, 1146 (1994) (stating the scope of review applied in an appeal from the decision of an administrative agency). "Thus, pursuant to Md.Code (1988, 1997 Repl.Vol.), § 13–532(a) of the Tax General Article, the final order of the Tax Court is subject to judicial review as provided in §§ 10–222 and 10–223 of the State Government Article, governing the standard of review for decisions of the administrative agencies." *Supervisor of Assessments v. Keeler*, 362 Md. 198, 207, 764 A.2d 821, 826 (2001). *See Read*, 354 Md. at 391, 731 A.2d at 872; *State Dep't of Assessments & Taxation v. Consumer Programs, Inc.*, 331 Md. 68, 71–72, 626 A.2d 360, 362 (1993).

operating real property or operating personal property for property tax purposes. Because we determine that Appellant's petroleum pipeline system is a trade fixture, and thus should be classified as operating personal property, we shall reverse the judgment of the Circuit Court and direct that court to reverse the decision of the Tax Court.

### B.

The thrust of Appellant's theory of the case is that the pipeline, pumps, meters, breakout tanks, and right-of-way easements are all part of one interrelated petroleum transportation system that should be classified as personal property for tax purposes. Appellant believes that no one element can function independent of the other elements, and therefore the tax status should be determined based on the transportation system as a whole, and not based on its component parts.[16] Appellant presents five arguments in support of its contentions. First, Appellant argues that the right-of-way easements in which the pipeline is located are personal property because they are easements in gross.[17] Next, Appellant contends that the classification of "underground facilities" as personal property, and the definition of "operating personal property" in the Maryland Code require that the pipeline system be treated as personal property under Maryland law.

---

**16.** Appellee's valuation methodology, it could be argued, impliedly incorporates this belief. The basis for SDAT's consideration of the entire pipeline system as a unit for its valuation methodology could be viewed as consistent with Appellant's argument. See *supra* at pages 26–27. As noted *infra,* however, Appellee expressly eschews such a view in favor of analysis of each individual component for classification purposes.

**17.** *See* BLACK'S LAW DICTIONARY 415 (7th ed.2000) defines an "easement in gross" as "[a]n easement benefitting a particular person and not a particular piece of land." *See also Callaway v. Forest Park Highlands Co.,* 113 Md. 1, 7, 77 A. 141, 144 (1910) (describing the nature of an easement in gross as a "mere personal right").

Md.Code (1998, 2001 Supp.), Public Utility Companies Art., § 12–101(j) [18] and TPA, § 1–101(u)(5).[19] Alternatively, Appellant asserts that the common law of fixtures also dictates that its pipeline system is personal property. *See Dudley & Carpenter v. Hurst,* 67 Md. 44, 8 A. 901 (1887)(stating the common law test for identifying fixtures). Appellant further asserts that even if the pipeline is deemed under the common law to be a fixture to the property through which it runs, it falls into the trade fixture exception recognized by this Court in *Anderson v. Perpetual Bldg. & Loan Ass'n,* 172 Md. 94, 98, 190 A. 747, 748–49 (1937). Finally, Appellant maintains that its pipeline system should be classified as personal property for tax purposes because similar types of public utility operating property, such as electric and telephone wires, are classified as personal property in Maryland. To treat Colonial's property otherwise, Appellant argues, would be a violation of the Equal Protection Clause of the U.S. Constitution and the Uniformity Clause of the Maryland Constitution.[20]

---

**18.** Maryland Code (1998, 2001 Supp.), Public Utility Company Article, § 12–101(j) defines, for purposes of regulating excavation or demolition occurring near underground facilities are:

(j) *Underground facility.*-(1) "Underground facility" means personal property that is to be buried or submerged for:

(i) use in connection with the storage or conveyance of water, sewage, oil, gas, or other substances; or

(ii) transmission or conveyance of electronic, telephonic, or telegraphic communications or electricity.

(2) "Underground facility" includes pipes, sewers, conduits, cables, valves, lines, wires, manholes, attachments, and those portions of poles below ground.

(3) "Underground facility" does not include a stormwater drain.

**19.** TPA, § 1–101(u)(5) provides that: "Operating personal property" includes "any property, other than real property, used to operate a railroad or public utility."

**20.** Maryland Constitution, Declaration of Rights, Article 15 states in pertinent part:

[t]he General Assembly shall, by uniform rules, provide for the separate assessment, classification and sub-classification of land, improvements on land and personal property, as it may deem proper; and all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform within each class or sub-class of land, improvements on land and

From its vantage point, Appellee contends that Appellant's pipeline, breakout tanks, and right-of-way agreements should not be viewed as one transportation system, but rather as separate parts that should be assessed individually as real property. To support its contention, Appellee focuses its analysis on the three major components of Appellant's pipeline system: the right-of-way easements, the pipeline, and the breakout tanks. First, Appellee argues that the right-of-way easements are real property under Md.Code TPA, § 1–101(cc).[21] Next, relying on this Court's decision in *Comptroller of the Treasury v. Steuart Invs. Co.*, 312 Md. 1, 537 A.2d 607 (1988), Appellee asserts that the breakout tanks also should be classified as real property for tax assessment purposes. Finally, Appellee argues that the pipeline is an improvement to the real property to which it is attached, and pursuant to the common law rule of fixtures, should be classified as real property. Although acknowledging that both telephone and electric wires are taxed as personal property in Maryland, Appellee argues that it is not unconstitutional for Appellant's property to be taxed as real property because the Maryland legislature has the power to establish separate classifications for similar items as long as legitimate governmental purposes underlie the different classifications. Thus, as Appellee's argument goes, SDAT's assessment of Appellant's property was correct and, as a result, the decision of the Maryland Tax Court affirming the assessments should be affirmed.

## C.

As noted *supra*, the three elements of the Colonial pipeline system; the pipeline, breakout tanks, and right-of-way easements, comprise a single system that transports refined petroleum between Texas and New Jersey, and points

---

personal property which the respective taxing powers may have directed to be subjected to the tax levy; yet fines, duties or taxes may properly and justly be imposed, or laid with a political view for the good government and benefit of the community.

21. TPA, § 1–101(cc) defines real property as follows: "(1) 'Real Property'-means any land or improvements to land. (2) 'Real Property' includes: (i) a leasehold or other limited interest in real property; and (ii) *an easement.*" (Emphasis added).

in between. As also stated earlier, no part of that system functions independently from the other parts. If repairs need to be made on any part of the pipeline, the system must be shut down until the repairs are complete. SDAT views the entire 5,000 mile transportation system between Texas and New Jersey as a single pipeline system for purposes of its valuation under the unitary system of valuation. Appellee's classification argument, however, that each component of the system needs to be independently evaluated and classified is unconvincing. Thus, our evaluation of Appellant's challenge to SDAT's classification of the pipeline system as real property will proceed by considering the pipeline system as a whole rather than as an analysis of its component parts. Other courts have treated similar systems as a unit for real or personal property classification purposes. *See Waterford Energy, Inc., v. Okla. Tax Comm'n,* 845 P.2d 198 (Okla.Civ.App.1992)(determining whether the classification of a gas-gathering pipeline system, including the right-of-way easements, as personal property was proper for the purpose of assessing a sales tax); *Dorchester Master Ltd. P'ship v. Dorchester Hugoton, Ltd.,* 914 S.W.2d 696 (Tex.App.1996)(evaluating whether a gas-gathering system consisting of pipelines, easements, and rights of way was real or personal property for the purpose of establishing subject matter jurisdiction over the property at issue); *Lingleville Indep. Sch. Dist. v. Valero Transmission Co.,* 763 S.W.2d 616 (Tex.App.1989)(considering whether a gas pipeline installed along an easement is real or personal property).

### D.

At common law, fixtures were treated as part of the realty.[22] A fixture was an item that was so connected to the land that it could not be removed without substantial injury to itself or the land. RICHARD R. POWELL, POWELL ON REAL

---

**22.** The English common law of fixtures derived from the Latin maxim *"quicquid plantatur solo, solo cedit"* meaning "whatever is annexed to the land becomes land."

PROPERTY, § 57–23 (1969). Chattels that are attached to real property in such a manner that they have lost their separate existence are deemed thereafter to be real property themselves. *Dudley,* 67 Md. at 47–48, 8 A. at 902. Items are said to have lost their separate existence if they are rendered useless or unadaptable to other uses upon removal from the realty. *See Consol. Gas v. Ryan,* 165 Md. 484, 493–94, 169 A. 794, 797 (1934). At early common law, adding fixtures to the land increased the value of that land for the purpose of securing the landowner's, usually a farmer's, debts. POWELL, *supra,* § 57–8. The interest of the landowner in using fixtures as collateral for security purposes has been preserved in the Uniform Commercial Code. *See, e.g.,* Maryland Code (1975, 2002 Repl.Vol.), Commercial Law Article, § 9–334 (describing the priority of security interests in fixtures and crops). The common law of fixtures eventually encompassed other relationships, such as vendor and purchaser; *W. Md. Dairy, Inc. v. Md. Wrecking and Equip. Co.,* 146 Md. 318, 126 A. 135 (1924); *Kirwan v. Latour,* 1 H. & J. 289 (1802), mortgagor and mortgagee; *Anderson,* 172 Md. 94, 190 A. 747; *Consol. Gas,* 165 Md. 484, 169 A. 794, landlord and tenant; *Cabana, Inc. v. E. Air Control,* 61 Md.App. 609, 487 A.2d 1209 (1985); *Teddy Rose–Enter., Inc. v. Hartford Fire Ins. Co.,* 48 Md.App. 466, 427 A.2d 1081 (1981), and more recently, taxation; *Steuart,* 312 Md. 1, 537 A.2d 607; *State Dep't of Assessments and Taxation v. Town and Country—Woodmoor,* 256 Md. 584, 261 A.2d 168 (1970).

The common law test for identifying fixtures considers the following factors:

First, annexation to the realty either actual or constructive. Second, adaptation to the use of that part of the realty with which it is connected. Thirdly, the intention of the party making the annexation, to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article annexed, the situation of the party making the annexation, the mode of annexation, and the purpose for which it was annexed.

*Dudley,* 67 Md. at 47, 8 A. at 902. An item is annexed to the land if it cannot be removed without serious injury. The common law required only actual annexation to the soil, but it has been modified to include items that have been "constructively annexed" to the land. *Dudley,* 67 Md. at 50, 8 A. at 903. Such annexation occurs when removal "leave[s] the principal thing unfit for use, and would not of itself and standing alone be well adapted for general use elsewhere...." *Id.* The second element of the test, adaptation, is met when an item "has become an important or essential part of the land's use or enjoyment." POWELL, *supra,* at § 57–27. This test requires a relationship between the land itself and the fixture. The affixed item must be adapted to the specific use of the land for it to be characterized as a part of that land. The intent requirement, however, is "the most important," and takes preeminence over the other two factors. *Dudley,* 67 Md. at 48, 8 A. at 902.

The common law annexation, adaptation, and intention factors as set forth in *Dudley* continue to control resolution of questions arising under the law of fixtures in Maryland. *See Schofer v. Hoffman,* 182 Md. 270, 274, 34 A.2d 350, 351(1943)(reiterating the rule set out in *Dudley,* and asserting that "no clearer rule or standard appears anywhere [than the common law rule of fixtures], and it has been consistently followed by this court"); *Woodmoor,* 256 Md. 584, 261 A.2d 168 (relying on the *Dudley* test as articulated in *Schofer*); *State Dep't of Assessments and Taxation v. Metrovision,* 92 Md.App. 194, 607 A.2d 110 (1992)(following the *Schofer* fixtures test).

The trade fixtures exception to the common law rule of fixtures dates back almost as far as the common law rule itself. *Van Ness v. Pacard,* 27 U.S. 137, 143–44, 2 Pet. 137, 7 L.Ed. 374, 376–77 (1829). In 1802, this Court held in *Kirwan* that "where a tenant puts up any thing for the purpose of carrying on his trade, he may remove it." 1 H. & J. at 291. A trade fixture commonly is defined as an item affixed to realty for the purpose of enabling the tenant to perform properly a trade or profession, which can be removed

without material or permanent injury to the realty. POWELL, *supra*, at § 57–45. The touchstone for the trade fixtures test, like the *Dudley* fixtures analysis, is intent: "[t]he sole question is, whether it is designed for purposes of trade or not." *Van Ness*, 27 U.S. at 146, 7 L.Ed. at 378. *See also Dudley*, 67 Md. at 48, 8 A. at 902 (stating that of the prongs of the fixtures test, "the most important is the question of intention"). When the proper intent is found, "[n]o matter how strongly [the fixtures are] attached to the soil or imbedded in it, they are treated as personal property, and as such subject to removal by the person erecting them." *N. Cent. Ry. Co. v. The Canton Co.*, 30 Md. 347, 352 (1869).

The policy justification for the trade fixtures exception is to encourage trade and manufacturing. *Van Ness*, 27 U.S. at 143–44, 7 L.Ed. at 376–77. The exception originally applied to landlord and tenant relationships to encourage tenants who otherwise would be reluctant to invest in affixing items beneficial to their trade upon the land for fear that this investment would be lost upon termination of the lease. POWELL, *supra*, § 57.06 at 3; *Homeseekers' Realty Co. v. Silent Automatic Sales Corp.*, 163 Md. 541, 547, 163 A. 841, 843 (1933). The trade fixture exception is no longer limited to leasehold agreements, and may be applied to property agreements granting temporary possession of real property to one who is not the owner of the property. *See Wiggins Ferry Co. v. Ohio & Miss. Ry. Co.*, 142 U.S. 396, 415, 12 S.Ct. 188, 194, 35 L.Ed. 1055, 1063 (1891)(holding that an easement granted by one party to another party was a trade fixture); *N. Cent. Ry.*, 30 Md. at 352 (applying the trade fixture exception in a licensor-licensee context); *Talley v. Drumheller*, 143 Va. 439, 130 S.E. 385, 386 (1925)(citing *Wiggins* and extending the trade fixture exception to a situation involving a right-of-way agreement); *Homeseekers'*, 163 Md. at 546, 163 A. at 843 (noting that holders of a temporary interest in land can own a trade fixture). Some courts have held that the trade fixture exception to the common law rule of fixtures extends to include items that have been placed on realty on the basis of an easement agreement. *Am. Tele. & Telegraph Co. v. Muller*,

299 F.Supp. 157 (D.S.C.1968); *Cherokee Pipe Line Co. v. Newman,* 593 P.2d 90 (Okla.1979); *In re: K & A Servicing, Inc.,* 47 B.R. 807, 812 (Bankr.N.D.Tex.1985).

There are a number of other jurisdictions that have addressed the particular question now before us: namely, whether, in a taxing situation, a pipeline system consisting of easements, pipelines, and break-out tanks, is a fixture to be treated as realty, or a trade fixture to be treated as personalty.

For example, in *Lingleville,* the Court of Appeals of Texas considered an appeal from a trial court's judgment that a gas transmission pipeline 390 miles in length was personal property, and that the taxing units had failed to bring suit within the four year limitation period for such actions, and were therefore barred from bringing their claim. 763 S.W.2d at 617. The petitioners, the taxing units, argued that the pipeline was a fixture and therefore real property not subject to the four year limitation period. *Id.* The trial court, applying the common law fixtures factors of annexation, adaptation, and intention, determined that although the pipeline had been annexed to the realty based on the fact that it was buried below plow-depth, the pipeline was placed on the property for trade purposes, and the owner of the pipeline, Valero, did not intend to make the pipeline a permanent accession to the land. *Id.* Therefore, the pipeline was a fixture, but of the trade variety because intent was determinative. The petitioner in that case specifically challenged the trial court's finding that respondent, Valero, did not intend to make the pipeline an accession to the land. *Lingleville,* 763 S.W.2d at 618. The Court of Appeals of Texas acknowledged that the intent criterion is determinative, and upheld the trial court's judgment, stating that the pipeline was "adapted for the transmission of gas," and was therefore "merely accessory to the business of Valero and [was] put on the land for the sole purpose of Valero." *Lingleville,* 763 S.W.2d at 618–19.

*Waterford* involved a challenge to a sales tax imposed on the sale of petitioner's rights in a gas-gathering pipeline that

consisted of easements and other machinery. 845 P.2d at 200. The Oklahoma court upheld the tax on the basis that the pipeline was personal property and therefore subject to the sales tax. *Waterford,* 845 P.2d at 200. The court applied the three-part common law fixtures test. It found that the adaptation prong was not satisfied because the pipeline benefitted the company holding the easement rights, rather than the owner of the real property. *Id.* Noting that "the intent of the party affixing the item to the land is the controlling consideration and chief test," the court concluded that the company did not intend that the pipeline be a permanent accession to the realty, and therefore held that the pipeline was a trade fixture, capable of removal, and could be properly classified as personal property subject to the sales tax. *Id.*

The Court of Appeals of Texas in *Dorchester* applied Oklahoma law and *Waterford.* 914 S.W.2d 696. The appellee in *Dorchester* filed a motion to dismiss the original suit alleging that the subject of the litigation, an Oklahoma gas-gathering system composed of pipelines, easements, and rights-of-way, was real property, and therefore outside the Texas court's subject matter jurisdiction. *Dorchester,* 914 S.W.2d at 702. The court, applying the *Waterford* fixtures analysis, held that the gas-gathering system at issue was personalty. The court based its holding on the third part of the common law fixtures test, concluding "[t]here is no question but that the Hooker Gas Plant gas-gathering system was installed for the sole purpose of gathering and processing the gas being produced from the gas field in question." *Dorchester,* 914 S.W.2d at 705.

These cases support the proposition that the determinative element of the fixtures test at common law is the intent of the party installing the fixture. As summarized by the Court of Appeals of Texas in the *Lingleville* case; "[t]he third criterion dealing with intention is preeminent, whereas the first and second criteria constitute evidence of intention." *Lingleville,* 763 S.W.2d at 618.

"A trade fixture is not a fixture." *K· & A Servic-ing,* 47 B.R. at 812. A trade fixture is not annexed to the soil in the manner of a fixture because it must be removable without permanently damaging the realty; and the intent of annexing a trade fixture to the land is to benefit the business of the party annexing the fixture to the land, not the land itself. The facts of the case before this Court do not support the argument that the pipeline is a fixture to be treated as part of the realty. Under the common law fixtures test, the pipeline is classified as a trade fixture and therefore personal property for tax purposes.

The first prong of the common law fixtures analysis, annexation to the realty, requires that the pipeline be affixed to the soil such that removal would result in serious injury to the property. Appellant's pipeline can be removed from the property through which it runs and, in fact, segments of its span across Maryland have been removed twenty-one times over the last twenty years. While it is true that the initial excavation to remove the pipeline causes a degree of damage to the landowner's property, this damage is only temporary. Once the pipeline has been removed, the surface of the property in question is returned to its original topography. After the pipeline is removed, it can be, and as the record shows actually is at times, used to replace faulty pipeline. This reuse of the pipeline demonstrates that the damage done to the pipeline upon removal is minimal. Accordingly, Appellant's pipeline system can be removed without substantial damage occurring to either the realty or the pipeline itself.

The pipeline system also fails to meet the second prong of the fixtures test because it is not adapted to the use of the realty into which it is installed. The pipeline runs under various roads, fields, rivers, and cities, without adapting to these uses of the land. Appellant points out that the right-of-way easement agreements themselves indicate that the pipeline system will be buried so as not to interfere with the landowner's intended use of the land. According to the specimen agreements in the record, the landowner can use the surface of the land in any manner, except for the construction

of a building or the installation of a swimming pool. As in *Waterford*, Colonial is not the landowner and therefore the pipeline is not accessory to the landowner's enjoyment of the land. The pipeline exists to benefit Colonial's business interests exclusively.

The first two elements of the fixtures test merely inform the analysis as one approaches the heart of the inquiry: whether Colonial intended the pipeline to be a permanent annexation to the land intended to benefit that land. As stated in *Van Ness*, 27 U.S. at 146, 7 L.Ed. at 377, "[t]he sole question is, whether it is designed for purposes of trade or not." *Id.* Appellant clearly was motivated by a single factor in installing the pipeline system: to operate its business for profit. The Tax Court recognized that Colonial's financial incentive to construct one of the world's largest pipeline systems was substantial. Colonial receives 2.25 cents per gallon of petroleum as its charge for transporting the product. The easement agreements provide that the landowners are to receive neither benefit from, nor ownership rights to, the pipeline system. Appellant financed the construction of the system, and thus, intended to be the sole beneficiary of the net profits from its investment. The pipeline, buried beneath the surface of the land, adds nothing to the enjoyment or utility of the land, and would not have been constructed by the landowners in the ordinary use of their land.

Colonial's intent clearly indicates that the pipeline system is a trade fixture. Similar to the facts of *Lingleville*, the Colonial pipeline system was "adapted for the transmission of gas [here, petroleum]," and is therefore accessory to Appellant's business. 763 S.W.2d at 618–19. Appellant has shown a clear intent to use the pipeline exclusively for trade purposes. Such use is not ancillary to the use of the realty. Accordingly, we reverse the decision of the Circuit Court and direct that court to reverse the decision of the Tax Court, concluding that Appellant's pipeline system is a trade fixture. As a result, the pipeline system should be classified as personal property for Maryland property tax purposes.

*JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE DECISION OF THE MARYLAND TAX COURT AND REMAND THE CASE TO THE TAX COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; APPELLEE TO PAY THE COSTS IN THIS COURT AND IN THE CIRCUIT COURT FOR CARROLL COUNTY.*